# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| MAACO FRANCHISOR SPV LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br>v.<br><br>JOSE LUIS NOVALES ARELLANO, an individual; NORMA FABIOLA ARAGON LEAL, an individual; and S A AUTOWORKS LLC, a Texas limited liability company,<br><br>    Defendants. | CASE NO.    5:20-cv-18 |

## COMPLAINT FOR FRAUD, BREACH OF CONTRACT AND TORTIOUS INTERFERENCE AND DEMAND FOR JURY TRIAL

For its causes of action against Defendants Jose Luis Novales Arellano, Norma Fabiola Aragon Leal and S A Autoworks LLC, Plaintiff Maaco Franchisor SPV LLC alleges as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has original jurisdiction over the parties and the subject matter of the action pursuant to 28 U.S.C. § 1332(a).  As alleged herein below,

there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

2. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) in that at least one of the Defendants resides in this District, and under 28 U.S.C. section 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in this District.

## II. THE PARTIES

3. Plaintiff Maaco Franchisor SPV LLC ("Maaco"), is a Delaware limited liability company that maintains its principal place of business at 440 S. Church Street, Suite 700, Charlotte, NC 28202. Maaco's sole member is Driven Brands, Inc., which is a Delaware corporation that maintains its principal place of business at 440 S. Church Street, Suite 700, Charlotte, NC 28202. Maaco is therefore a citizen of Delaware and North Carolina.

4. Maaco is informed and believes and, on that basis, alleges that Defendant Jose Luis Novales Arellano ("Novales") is an individual who is a citizen of Mexico, but who has represented to Maaco that he is a lawful permanent resident, whose domicile is in Bexar County, Texas. Novales is therefore either a citizen of the State of Texas or is a citizen of Mexico.

5. Maaco is informed and believes and, on that basis, alleges that Defendant Norma Fabiola Aragon Leal ("Leal") is an individual whose domicile is

in Bexar County, Texas.  Leal is therefore a citizen of the State of Texas.  Maaco is

further informed and believes and, on that basis, alleges that Novales and Leal are

husband and wife.

6.       Maaco is informed and believes and, on that basis, alleges that

Defendant S A Autoworks LLC ("Autoworks") is a limited liability company

organized and existing under the laws of the State of Texas and that Defendant

Leal is the sole and managing member of Autoworks.  In the alternative, to the

extent Leal is not the sole member of Autoworks, Maaco is informed and believes

and, on that basis, alleges that none of Autoworks' members is a citizen either of

Delaware or of North Carolina.

## III.    THE FRANCHISE DOCUMENTS

7.       On March 24, 2016, Maaco and Novauto LLC ("Novauto"), as

Franchisee, entered into a Maaco Franchisor SPV LLC Franchise Agreement (the

"Franchise Agreement") with a fifteen (15) year initial term.  A true and correct

copy of the Franchise Agreement is attached hereto as Exhibit A.  Novales

executed the Franchise Agreement as the "Authorized Representative" of Novauto.

8.       Concurrently with the execution of the Franchise Agreement, Novales

(as Guarantor) executed a Personal Guaranty (the "Guaranty"), a true and correct

copy of which is attached hereto as Exhibit B.  The Guaranty provides, in pertinent

part:

Guarantor [Novales], severally, irrevocably and unconditionally guarantees to MAACO: (i) that Franchisee will pay all amounts to be paid and otherwise comply with all provisions of the Franchise Agreement or any other agreement with MAACO or its affiliates concerning the operation of the Center; and (ii) that if Franchisee defaults in making any such payments or complying with any such provisions, Guarantor shall, upon demand, pay all amounts due and owing MAACO and all damages that may arise as a result of any such noncompliance.

9.      Section 2 of the Franchise Agreement set forth certain obligations of Franchisee with respect to the acquisition of a site for the operation of the Maaco franchise.  Among other things, Franchisee was required to obtain a lease for suitable premises, to be approved by Maaco, and the lease was subject to Section 2(C) of the Franchise Agreement which provides, in pertinent part:

[The] lease shall, among other things, provide that:

(1)      The premises shall only be used for the operation of the Maaco Center;

(2)      Franchisee may not sublease or assign the lease or any part thereof;

(3)      MAACO shall have the right to enter the premises to make any modifications necessary to protect the Proprietary Marks; and

(4)      MAACO shall have the right, at MAACO's election, to receive an assignment of the leasehold interest upon termination or expiration of this Agreement for any reason.

10.     Novauto, as Tenant, and Villegas Masonry Inc., as Landlord, executed a Texas Association of Realtors Commercial Lease (the "Lease") for the premises located at 7490 N. FM 1560, Ste. 7490A, San Antonio, Texas (the "Franchise

Premises") with a Lease inception date of June 1, 2016 and an initial term of 120 months.  A true and correct copy of the Lease (including all addenda thereto) is attached hereto as Exhibit C.

11.    On or about June 1, 2019, Novauto, under the control and direction of Novales, began operating a Maaco franchise business at the Franchise Premises.

12.    The Franchise Agreement required Novauto to pay certain sums to Maaco on a weekly basis, including a royalty fee and an advertising contribution fee (collectively, the "Franchise Fees").  The Franchise Fees are based on specified percentages of the "gross receipts" from the franchise business, which receipts are provided to Maaco by the franchisee in a Weekly Business Report (as defined in Section 5(B)).

13.    On October 25, 2019, Novauto filed a petition under Title 11 of the United States Code in the United States Bankruptcy Court for the Western District of Texas (the "Bankruptcy Court"), commencing the Chapter 7 case entitled In re Novauto, LLC, Case No. 19-52508-rbk (the "Novauto Chapter 7 Case").  John Patrick Lowe (the "Trustee") was appointed as Chapter 7 Trustee in the Novauto Chapter 7 Case.

14.    Novauto's bankruptcy schedules were signed under penalty of perjury by Defendant Novales.

15.     The Trustee commenced the 11 U.S.C. § 341a meeting of creditors in the Novauto Chapter 7 Case on November 27, 2019 and continued the meeting on December 10, 2019.  Defendant Novales testified under oath at the meeting of creditors on both dates.  In the bankruptcy schedules he signed under penalty of perjury and in his testimony under oath at the meeting of creditors, Novales testified falsely that he had not personally guaranteed any of the debts of Novauto.

16.     Maaco is informed and believes and, on that basis, alleges that Defendant Autoworks was formed by Defendants Novales and Leal in September, 2019 for the purpose of taking over possession of the Franchise Premises and operating a business known as "Culebra Collision," which is a direct competitor of Maaco, at the premises.

## FIRST CLAIM FOR RELIEF
### (Fraud Against Defendant Novales)

17.     Maaco realleges and incorporates herein by this reference as though set forth in full each and every allegation contained in paragraphs 1 through 16, inclusive.

18.     Maaco is informed and believes and, on that basis, alleges that beginning immediately from the time it began operating the Maaco franchise, Novauto under-reported its gross revenues to Maaco by submitting false and inaccurate Weekly Business Reports, which reports were prepared by, or under the direction of, Defendant Novales.

19.     The result of Novauto's under-reporting of gross revenues is that it paid Franchise Fees in an amount less than what was actually owed to Maaco.

20.     Maaco did not know, and in the exercise of reasonable diligence could not have known, that Novauto was fraudulently under-reporting its gross sales until November, 2019, when the Trustee provided Maaco with copies of Novauto's bank account records, which he obtained in his capacity as Trustee in the Novauto Chapter 7 case.  When Maaco received Novauto's bank account records, it discovered that Novauto, under the direction and control of Novales, was under-reporting gross revenues amounting to approximately $400,000 per year.

21.     Novales prepared and submitted the false Weekly Business Reports with the intention of inducing Maaco to rely on the accuracy of those reports. Maaco, having no reason to believe the Weekly Business Reports were false, reasonably relied on the accuracy of the reports.  The false representations made by Novauto at the direction of Novales were material in that a reasonable recipient of such information would alter its behavior in reliance on the information.  In this case, relying on the Weekly Business Reports, Maaco continued in its contractual relationships with Novauto and Novales when, had the true facts been known about Novales' under-reporting of gross sales and underpayment of Franchise Fees, Maaco would have terminated those relationships several years ago.

22.     As a direct and proximate result of the actions of Novales, Maaco has suffered damages in an amount to be proven at trial, but in excess of $75,000 exclusive of interests and costs.

23.     Novales' actions, as alleged above, were committed with malice as defined in Texas Civil Practice and Remedies Code Section 41.100(7) in that his actions were specifically intended to harm Maaco in its business. Such conduct warrants the assessment of exemplary damages against Novales under Texas Civil Practice and Remedies Code Section 41.003.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract (Guaranty) Against Defendant Novales)

24.     Maaco realleges and incorporates herein by this reference as though set forth in full each and every allegation contained in paragraphs 1 through 23, inclusive.

25.     Although he repeatedly represented under penalty of perjury that he had not done so, Defendant Novales executed the Guaranty under which he personally guaranteed Novauto's obligations under the Franchise Agreement.

26.     Novauto breached the Franchise Agreement by, among other things, (a) failing to pay the Franchise Fees due under the agreement, (b) terminating the operation of the Maaco franchise with six years left on the initial term; and (c) failing to assign the Lease to Maaco as required under Section 5(B) of the Franchise Agreement.  Based on the Novauto bank records provided by the

Trustee, Maaco expected to receive approximately $120,000 per year in Franchise Fees for the remaining term of the Franchise Agreement.

27.     Defendant Novales has breached his obligations under the Guaranty by failing to pay the amounts due to Maaco as a result of Novauto's breaches of the Franchise Agreement.

28.     Maaco performed all of its obligations under the Franchise Agreement and the Guaranty.

29.     As a direct and proximate result of the actions of Novales in breaching his obligations under the Guaranty, Maaco has suffered damages in an amount to be proven at trial, but in excess of $700,000, exclusive of interests and costs.

30.     Section 8 of the Guaranty provides: "In the event that MAACO retains the services of legal counsel to enforce the terms of this Guaranty, MAACO shall be entitled to recover all costs and expenses, including reasonable attorneys', expert and investigative fees, incurred in enforcing the terms of this Guaranty."

31.     Maaco is entitled to recover its reasonable attorneys' fees against Novales pursuant to the terms of the Guaranty as set forth above and pursuant to Tex. Civ. Prac. & Rem. Code § 38.001 et seq.

## THIRD CLAIM FOR RELIEF
### (Tortious Interference with Contract Against Defendants
### Leal and Autoworks)

32.     Maaco realleges and incorporates herein by this reference as though set forth in full each and every allegation contained in paragraphs 1 through 16 and 26 through 31, inclusive.

33.     Defendants Leal and Autoworks were aware of the Franchise Agreement and Novauto's obligations under the agreement, including the obligation to operate a Maaco franchise for the full 120-month term of the Franchise Agreement and Novauto's obligation to assign any rights in the Lease to Maaco in the event of early termination or expiration.

34.     Defendants Leal and Autoworks, with the knowledge and assistance of Novales, willfully and intentionally induced Novauto to breach and violate the above-described provisions of the Franchise Agreement so that they could (a) take over the paint and body business at the Franchise Premises, free of any obligation to pay Franchise Fees, (b) cheat Maaco out of the benefits it stood to reap through the Franchise Agreement by terminating the franchise with six years left under the Franchise Agreement and by failing to assign the Lease to Maaco, and (c) by conspiring with Novales to put Novauto into a no-asset Chapter 7 bankruptcy in order to deprive Maaco of any recourse for its losses.

35.     As a direct and proximate result of the actions of Leal and Autoworks in willfully and intentionally inducing Novauto to breach its obligations under the Franchise Agreement, Maaco has suffered damages in an amount to be proven at trial, but in excess of $700,000 exclusive of interests and costs.

36.     The actions of Leal and Autoworks, as alleged above, were fraudulent and were committed with malice as defined in Texas Civil Practice and Remedies Code Section 41.100(7) in that his actions were specifically intended to harm Maaco in its business. Such conduct warrants the assessment of exemplary damages against Leal and Autoworks.

## PRAYER

**WHEREFORE**, Plaintiff Maaco Franchisor SPV LLC requests that the Court grant relief as follows:

1.   That judgment be entered in its favor and against Defendants, and each of them;

2.   For compensatory damages in an amount to be proved at trial, but in excess of $700,000;

3.   For punitive and exemplary damages;

4.   For reasonable attorneys' fees and costs;

5.   For pre-judgment and post-judgment interest allowed by law; and

6.   For such other and further relief as the Court deems just and proper.

**LAW OFFICES OF LAWRENCE J. HILTON**

By: _____

Lawrence J. Hilton
State Bar No. 24105017
4514 Cole Avenue, Suite 500
Dallas, TX  75202
Telephone:     (214) 559-7176
Facsimile:      (949) 258-5081
Email:          lhilton@onellp.com

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Grecco hereby demands a trial by jury as to all claims and all issues properly triable thereby.

LAW OFFICES OF LAWRENCE J. HILTON

By: _____
Lawrence J. Hilton
State Bar No. 24105017
4514 Cole Avenue, Suite 500
Dallas, TX  75202
Telephone:	(214) 559-7176
Facsimile:	(949) 258-5081
Email:	lhilton@onellp.com

# EXHIBIT A

M2767

## MAACO FRANCHISOR SPV LLC
## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** (the "Agreement"), made and entered into as of _March 24, 2016_, ("Effective Date") between Maaco Franchisor SPV LLC, a Delaware limited liability company, with its principal office at 440 South Church Street, Suite 700, Charlotte, North Carolina 28202 ("MAACO") and Novauto LLC, a(n) Texas limited liability company, with its principal office at 23835 Spring Scent, San Antonio, Texas 78258 ("Franchisee").

### W I T N E S S E T H:

**WHEREAS**, MAACO, its predecessors and affiliates have accumulated extensive knowledge of, and experience in the vehicle painting and body repair business and has developed and owns a unique system (the "System") relating to the establishment, development, marketing, administration and operation of centers specializing in vehicle painting and body repair ("Maaco Centers") which may be changed, improved and further developed by MAACO from time to time;

**WHEREAS**, MAACO is the owner of the trade names, trademarks and service marks, "Maaco Collision Repair & Auto Painting," "Maaco Auto Painting and Bodyworks," "Cosmollision" and such other trade names, service marks, and trademarks as are now designated (and may hereinafter be designated by MAACO) as part of the System (the "Proprietary Marks"), and MAACO continues to develop, use and control such Proprietary Marks for the benefit and exclusive use of itself and its franchises in order to identify for the public the source of services and products marketed thereunder and to represent the System's high standards of quality and service;

**WHEREAS**, Franchisee has applied to MAACO for a franchise to operate a Maaco Center under the System and to receive the training and other assistance provided by MAACO, and such application has been approved in reliance upon all of the representations made therein;

**WHEREAS**, Franchisee understands and acknowledges the importance of MAACO's high and uniform standards of quality and service and the necessity of operating the business franchised hereunder in conformity with MAACO's standards and specifications;

**NOW, THEREFORE**, the parties, in consideration of the undertakings and commitments of each party to the other party set forth herein, hereby mutually agree as follows:

1. **APPOINTMENT**

A. MAACO hereby grants to Franchisee, upon the terms and conditions herein contained, the right and franchise to operate a Maaco Center (the "Center"), and to use solely in connection therewith the System, as it may be changed, improved and further developed from time to time and the Proprietary Marks, within the following designated area (the "Designated Area"):

San Antonio, TX

Franchisee accepts this grant and agrees to use his best efforts to develop the business potential of the Center utilizing the System.

B.  Provided Franchisee is in compliance with this Agreement, MAACO will not during the term of this Agreement establish, nor will a franchisee establish a Maaco Center for each fifty thousand (50,000) persons in the Core Based Statistical Area ("CBSA") (as such CBSA is defined as of the date of this Agreement by the Office of Management and Budget) in which the Center is located.   This area will be a "Protected Area", and the Protected Area shall be determined as of the date that MAACO seeks to grant an additional license or franchise in proximity to the Protected Area.  Franchisee shall not relocate the Center without prior written approval of MAACO.

C.  Except as provided herein, Franchisee expressly acknowledges and agrees that, this franchise is nonexclusive and that MAACO or its subsidiaries or affiliates or other franchisees or licensees of MAACO may compete with franchisees for customers within and outside of the territory described above.  Franchisee further acknowledges and agrees that customers of Maaco Centers are generated under the brand and belong to the System, thereby enhancing the value of the brand.

## 2.  SELECTION OF SITE

A.  Franchisee shall use its best efforts to seek and select a proposed location with the Designated Area acceptable to MAACO as suitable for the operation of a Maaco Center. Franchisee shall submit to MAACO, in the form specified by MAACO, a description of the location and such other information or materials as MAACO may require.  MAACO's approval of a site shall not constitute, nor be deemed, a judgment as to the likelihood of success of the Center at such location or a judgment as to the relative desirability of such location in comparison to other locations within the Designated Area.

B.  Franchisee shall secure a site for the Center by lease or purchase within eighteen (18) months from the date of execution of this Agreement.  In the event Franchisee fails to secure a site within this time period, or, if at any time after the execution of this Agreement and prior to the time Franchisee secures a site for the Center, MAACO determines in its judgment that Franchisee has not made good faith efforts to seek and select a suitable location or to secure financing for the development of the Center or that Franchisee has been uncooperative with MAACO during any one or more phases of the pre-operational process, then MAACO shall have the right to terminate this Agreement upon written notice to Franchisee.  In such event, MAACO will refund, without interest, the amount of the initial franchise fee paid less our costs and expenses relating to processing Franchisee's application, including franchise sales commissions, and evaluating proposed locations, which costs and expenses will not be less than Ten Thousand Dollars ($10,000.00), provided Franchisee signs a general release in form and substance satisfactory to MAACO.

C.  MAACO will provide site specifications and standards for general location and zoning, neighborhood, parking requirements, layout and other physical characteristics and lease terms and conditions for Maaco Centers, including lease duration and rental, or terms of purchase, including debt service, in the event Franchisee is purchasing the location for the Center.  Franchisee shall submit the lease, if any, prior to its execution to MAACO for its approval, which approval shall not be unreasonably withheld, and which lease shall, among other things, provide that:

(1)     The premises shall only be used for the operation of the Maaco Center;

(2)     Franchisee may not sublease or assign the lease or any part thereof;

(3)     MAACO shall have the right to enter the premises to make any modifications necessary to protect the Proprietary Marks; and

(4)     MAACO shall have the right, at MAACO's election, to receive an assignment of the leasehold interest upon termination or expiration of this Agreement for any reason.

In addition, at the request of MAACO, Franchisee shall execute a collateral assignment of Franchisee's lease in the form prescribed by MAACO to secure Franchisee's obligations under this Agreement.

D.  Franchisee shall, prior to occupancy of the Center, submit to MAACO a statement signed by Franchisee certifying that Franchisee has obtained all permits and certifications required for operation of the Center, including, without limitation, zoning, access, sign and fire requirements.

E.  Franchisee may request that MAACO agree to a termination of this Agreement at any time after the expiration of nine (9) months from the date of execution of this Agreement, but before the expiration of eighteen (18) months from the date of execution of this Agreement, provided Franchisee, in MAACO's judgment, has made good faith efforts to obtain a site for the Center but has been unable to do so by that date.  If MAACO agrees to such termination, MAACO shall refund, without interest, the amount of the initial franchise fee paid less its costs and expenses relating to processing Franchisee's application, including franchise sales commissions, and evaluating proposed locations, which costs and expenses will not be less than Ten Thousand Dollars ($10,000.00), provided Franchisee sign a mutual release in form and substance satisfactory to MAACO.

F.  Franchisee agrees to open the Center within eighteen (18) months after the date of execution of this Agreement.  However, if Franchisee's failure to open its Center within such eighteen (18) month period is due to reasons beyond Franchisee's control (such as acts of God, unavoidable delays in obtaining zoning permits or unavoidable construction delays), at MAACO's discretion MAACO may grant a reasonable extension of time for Franchisee to open its Center.  If however, Franchisee has not opened its Center within this 18 month period and no extension has

been granted to Franchisee then at MAACO's option Franchisee's MAACO franchise will be terminated and Franchisee will forfeit all of fees paid under this Agreement.

G. In the event Franchisee elects to purchase an existing Maaco Center following execution of this Agreement, MAACO will retain from the amount of the initial franchise fee paid its reasonable expenses incurred, and, if applicable, any franchise business broker fees or commissions that were paid or are payable by MAACO. The remainder, if any, of the initial franchise fee paid shall be applied to Franchisee's transfer fee, the Initial Training and Opening Fee (as defined in Paragraph 5B(3)), initial advertising deposit or any other amounts payable to or due MAACO in connection with the transfer.

H. In the event of a termination of this Agreement as described in Paragraph 2(B) or (E) above, Franchisee shall execute a mutual release in a form satisfactory to MAACO, of any and all claims against MAACO, its parents, affiliates and subsidiaries, together with all of their respective former, present and future officers, directors, shareholders, employees, agents, attorneys, servants, representatives, heirs, successors, assigns and predecessors, in their corporate and individual capacities.

3. **TERMS AND RENEWAL**

A. The term of the franchise shall begin on the Effective Date and expire fifteen (15) years from the date the Center opens for business as determined by MAACO.

B. Franchisee may, at its option, renew this franchise for one (1) additional term of fifteen (15) years, provided that:

(1) Franchisee has given MAACO written notice of election to renew not less than six (6) months nor more than twelve (12) months prior to the end of the initial term;

(2) Franchisee must pay all past due amounts under this Agreement and any other agreements between Franchisee and MAACO or its subsidiaries or affiliates;

(3) Franchisee is not in default of any provision of this Agreement, any amendment hereof or any other Agreement between Franchisee and MAACO or its subsidiaries or affiliates and has substantially complied with all the terms and conditions of such agreements during the terms thereof;

(4) Franchisee agrees to execute upon renewal MAACO's then current form of franchise agreement, which agreement shall supersede in all respects this Agreement, and the terms of which may differ from the terms of this Agreement including, without limitation: (i) a higher percentage royalty fee; and (ii) a continuing weekly advertising contribution in an amount equal to Franchisee's weekly budget at the time of renewal, or the amount set forth in MAACO's then current franchise agreement, whichever is greater; and

(5) At MAACO's request, Franchisee shall execute a general release in a form satisfactory to MAACO, of any and all claims against MAACO, its parents, affiliates and subsidiaries, together with all of their respective former, present and future officers, directors, shareholders, employees, agents, attorney, servants, representatives, heirs, successors, assigns and predecessors, in their corporate and individual capacities.

(6) If Franchisee has failed to renew Franchisee's MAACO franchise license at the end of the initial term of Franchisee's Agreement and Franchisee continue to operate Franchisee's Center after the expiration date then at MAACO's option MAACO can treat Franchisee's continued operation of Franchisee's Center as an extension or renewal of Franchisee's MAACO franchise agreement.  If MAACO treats it as an extension then MAACO may terminate Franchisee's Franchise thereafter for any reason upon 30 days written notice to Franchisee.

C.      A renewal fee of Two Thousand Five Hundred Dollars ($2,500.00) shall be paid upon execution of the renewal agreement which, when paid to MAACO, shall be deemed fully earned and non-refundable.

D. Franchisee shall complete the following Center refurbishing tasks, at Franchisee's expense, upon renewal of the franchise:

(1)      Install MAACO's then-current merchandising system;

(2)      Install MAACO's then-current exterior signage and trade dress;

(3)      Complete general cleaning, fixing, repairing and painting of the Center;

(4)      Complete maintenance service of the equipment (including, but not limited to, the oven, booth, mixing equipment and compressors); and

(5)      Replace equipment not repairable, as necessary.

E. Franchisee must provide MAACO with a copy of the lease agreement in effect for the Center location.  The lease term must be at least equal to the term or any renewal term.

F. Franchisee must provide MAACO with an assignment of its leasehold interest upon termination or expiration of any renewal term.

4.  **DUTIES OF MAACO**

A. MAACO shall provide an initial training program to Franchisee and the majority investor in the franchise (as defined in Paragraph 7B hereof), and make available such other training programs as it deems appropriate.  If Franchisee is an existing franchisee, MAACO can require Franchisee or Franchisee can elect to attend the initial training program before the Center opens.  All training shall be at such times and places as may be designated by MAACO.

B. MAACO shall use Franchisee's initial advertising contribution to provide for the opening promotion and initial advertising of the Center.

C. MAACO shall provide such initial and continuing advisory assistance in the operation of the Center as it deems appropriate.

D. MAACO shall provide Franchisee with a set of specifications as to the types and quantities of inventory, supplies and equipment necessary for operation of the Center and specifications for exterior and interior signs.

E. MAACO shall provide Franchisee one copy of the Confidential Operating Manual, as more fully described in Paragraph 10 hereof.

F. MAACO shall conduct, as it deems advisable, inspections of the Center and evaluations of the vehicle painting and body repair services rendered at the Center.

G. MAACO shall administer the advertising funds paid hereunder in the manner prescribed by Paragraph 6B hereof.

## 5. FEES AND OTHER PAYMENTS

A. Franchisee agrees to pay MAACO the following fees:

(1) An initial franchise fee of Thirty-Five Thousand Dollars ($35,000.00) which, when paid to MAACO, shall be deemed fully earned and non-refundable, except as noted herein, and shall be payable upon execution of this Agreement.

(2) A non-refundable "Initial Software License Fee" for access to the shop management system (the "Management System") that Franchisee must purchase and use in the Center. The Initial Software License Fee is equal to the then current fee being charged and payable before MAACO or its third party vendor delivers access to the Management System to Franchisee or thirty (30) days prior to the scheduled opening of the Center, whichever occurs first. Franchisee also must purchase all required hardware to operate the Management System. In addition, MAACO or its third party supplier will charge Franchisee a monthly license fee for access to the Management System and support MAACO or its designee provides to Franchisee for the Management System. Franchisee must enter into any software license agreement MAACO requires for use of the Management System. MAACO has the right to designate a single source from which Franchisee must purchase the Management System, any software or hardware components thereof or associated service, and MAACO or its affiliates may be that single source. Notwithstanding the foregoing, if the Franchisor requires Franchisee to utilize different shop management system, software, hardware or related technology systems, Franchisee must use such shop management system, software, hardware and systems, will pay the then-current costs of such shop management system, hardware, software or systems charged to MAACO, or MAACO's designated vendor, including initial license fees, equipment purchases, technology fees or maintenance fees. MAACO also may access

financial information and customer data produced by or otherwise located on the Management System.

(3) A non-refundable "Initial Training and Opening Fee" of Five Thousand Dollars ($5,000.00) payable upon Franchisee's arrival at the initial training program (or thirty (30) days prior to the scheduled opening of the Center if Franchisee is an existing franchisee who will not attend the initial training program). Franchisee may choose to pay an additional Two Thousand Five Hundred Dollars ($2,500.00) for a second person to also attend training, payable upon Franchisee's arrival at the initial training program. MAACO shall apply the Initial Training and Opening Fee to MAACO's expenses in providing pre-opening and opening assistance, including providing Franchisee with its initial training in the operation and management of the Center, real estate selection assistance, and financing assistance.

(4) A continuing weekly royalty fee during the term of this Agreement in an amount equal to nine percent (9%) of the gross receipts of the Center. The continuing weekly royalty fee shall be due and payable by Friday of each week on gross receipts of the Center for the previous week.

(5) MAACO reserves the right to charge Franchisee a weekly "Technology Access Fee" in connection with MAACO website, extranet system, applications, and other technology platforms and developments. MAACO reserve the right to increase the Technology Access Fee with thirty (30) days prior written notice to Franchisee.

B. All continuous advertising contributions and royalty fees on gross receipts shall be due on Friday of each week on gross receipts for the preceding week, together with a signed statement in the form prescribed by MAACO reflecting all gross receipts for the week's business, including specific customer information, costs incurred, cash transactions, customer invoices and such other data and information as MAACO may require (the "Weekly Business Report"). In the event that the weekly royalty fees and advertising contributions are paid by Friday for the previous week's business and submitted with the Weekly Business Report, the royalty fee payable shall be reduced to eight percent (8%) of gross receipts as a cash discount, provided that Franchisee is current as of the date of payment with all weekly royalty fees, advertising contributions and any other monies due MAACO or its affiliates or subsidiaries. All payments are required to be withdrawn via electronic withdrawal, and Franchisee hereby consents to MAACO making such electronic withdrawals, and must comply with the terms of subsection F below.

C. MAACO and its affiliates have developed, and MAACO manages and controls a national accounts program with various fleet and commercial accounts (the "National Accounts Program"). Under the National Accounts Program, qualified Maaco Centers that meet MAACO's standards and criteria will be selected by MAACO to provide paint and body service repair services to MAACO's fleet and commercial accounts. At MAACO's option, all services provided by Franchisee under the National Accounts Program will be centrally billed through MAACO. In the event Franchisee is not current with payment of all weekly royalty fees, advertising contributions and any other monies due MAACO, MAACO will apply all or a

DocuSign Envelope ID: 94DEA414-7B94-480E-97CB-24B4A962EDDB

portion of the payment for services rendered under the National Accounts Program to Franchisee's past due accounts.

    D.  If any payment to MAACO under this Agreement or any other agreement or account with MAACO or its affiliates or subsidiaries is overdue, Franchisee shall pay to MAACO or its affiliates or subsidiaries interest compounded monthly on such amount from the due date until paid at the maximum rate permitted by law (or, in the absence of such rate, a rate equal to one and a half percent (1.5%) per month).  Entitlement to such interest shall be in addition to any other remedies MAACO or its affiliates or subsidiaries may have.

    E.  Gross receipts as used herein shall mean the amount of all cash collected, or other consideration received, for all sales of merchandise and services of any nature at or from or as a result of the Center, including, but not limited to, sublet labor and new and used replacement parts, less sales or equivalent taxes.

    F.  At MAACO's request, Franchisee shall promptly execute or re-execute within five (5) days after MAACO's request and deliver to MAACO, in the form required by MAACO, pre-authorized checks or such other instruments or drafts, payable against Franchisee's bank account to enable MAACO to collect by electronic withdrawal the royalty fees and continuing advertising contributions due under the terms of this Agreement.  MAACO may require that Franchisee establish a commercial bank account at a bank that meets MAACO's requirements.  MAACO may further require that Franchisee's account have minimum overdraft protection in an amount determined by MAACO.  Franchisee shall deposit all collected gross receipts into its commercial bank account as soon as practicable but in no event later than the end of the business day following receipt.  In the event Franchisee changes the banking institution or the account for its commercial business bank account that MAACO has on record, Franchisee shall provide MAACO with ten (10) days' written notice prior to changing the banking institution or the account and Franchisee shall re-execute the appropriate form(s) required by MAACO to reflect the change in account information within the time necessary for timely electronic withdrawals from the new account.

    Franchisee shall submit, for MAACO's receipt by Friday of each week for the preceding week, the Weekly Business Report (as defined in Paragraph 5B).  In the event that the Weekly Business Report is received by MAACO on Friday for the previous week's business and the applicable royalty fees and advertising contributions due thereon are paid by Friday, the royalty fee payable shall be reduced to eight percent (8%) of gross receipts as a cash discount, provided that Franchisee is current as of the date of payment with all weekly royalty fees, advertising contributions and other monies due MAACO or its affiliates or subsidiaries.  If Franchisee fails to submit the Weekly Business Report on a timely basis as stated herein, MAACO shall estimate the amount of Franchisee's gross receipts by using the last reported amount of gross receipts by Franchisee to MAACO and MAACO shall calculate the royalty fees due at nine percent (9%).  Upon MAACO's receipt of the required Weekly Business Report from Franchisee reflecting the actual gross receipts, MAACO will recalculate the royalty fees due at nine percent (9%) of the gross receipts reported and MAACO shall debit or credit the Franchisee's royalty fee obligation for that week accordingly.

On Friday of each week, MAACO will deposit or transfer into its own account, using Franchisee's pre-authorized checks or other instruments, the amount of royalty fees (or in the absence of a Weekly Business Report, the estimated amount of royalty fees) and the advertising contributions due for the preceding week. If any draft, electronic or otherwise, is unpaid because of insufficient funds or otherwise, royalty fees shall be due at nine percent (9%) of the gross receipts, and Franchisee shall pay all of MAACO's expenses arising from such non-payment including bank fees.

## 6. ADVERTISING AND TELEPHONE

### 6.1 ADVERTISING

Recognizing the value of advertising, and the importance of the standardization of advertising programs to the furtherance of the good will and public image of the System, the parties agree as follows:

A. Franchisee shall pay to MAACO an initial advertising contribution in the amount of Thirty Thousand Dollars ($30,000.00) payable upon Franchisee's arrival at the initial training program (or thirty (30) days prior to opening if Franchisee is an existing franchisee who will not attend the initial training program), for pre-opening and grand opening promotion, promotional materials, initial crew ads, initial advertising of the Center and related activities. The actual cost may exceed Franchisee's initial advertising contribution, in which case MAACO will charge Franchisee the difference.

B. Franchisee shall pay MAACO a continuing weekly advertising contribution in the amount of Eight Hundred Fifty Dollars ($850.00), or an amount equal to the weekly advertising budget of Franchisees operating in Franchisee's designated market area, whichever is greater, for the creation and placement of advertising and promotional programs by MAACO for the benefit of the System, including website development, telemarketing and Maaco Center locator numbers. Notwithstanding anything stated to the contrary, during the first six (6) months that Franchisee opens its new Center the amounts that Franchisee contributes as stated above may be spent on local marketing for Franchisee's Center or for the local market as determined by MAACO within its sole discretion. Any such local marketing done on a local market basis will include the center information of existing franchisees in said marketing area as MAACO may deem appropriate from time-to-time. All weekly advertising contributions shall be payable at the same time as the weekly royalty payments due under Paragraph 5A hereof. Franchisee hereby acknowledges MAACO's right to pay from the advertising funds collected all costs and expenses related to the formulation, development, production, media and all other costs of such advertising and promotion (including without limitation, the proportionate compensation of employees of MAACO who devote time and render services in the conduct, formulation, development and production of such advertising and promotion programs or the administration of the funds used therefore.) Franchisee hereby acknowledges that advertising contributions payable hereunder will not be used to pay for Yellow Page advertising of Franchisee (see Paragraph 6D below). Franchisee agrees that MAACO may increase the amount of such advertising contributions on or after the date hereof and Franchisee shall pay such increased amounts in accordance with this Paragraph 6B; provided, however, that the amount of such increase after the first twelve (12)

months of Franchisee's operations shall not exceed ten percent (10%) per year.  The amount of the increase in advertising contributions chargeable to Franchisee hereunder shall be cumulative and if MAACO does not increase the advertising contribution of Franchisee by the maximum amount permitted hereunder in any given year, MAACO may add the amount not charged to Franchisee in any given year to the amount chargeable to Franchisee in subsequent years. MAACO will spend all advertising contributions hereunder for advertising and promotion as herein described, provided that it shall not be obligated to spend such contributions in the year in which paid by Franchisee.  Franchisee acknowledges and understands that advertising and promotion conducted by MAACO is intended to maximize general public recognition and patronage of the System in the manner determined to be most effective by MAACO and that MAACO undertakes no obligation in developing, implementing or administering such programs to ensure that expenditures which are proportionate or equivalent to Franchisee's contributions are made for the Center or that any Maaco Center will benefit directly or pro rata from the placement of advertising.  MAACO will provide an annual statement of receipts and disbursement with respect to advertising contributions payable hereunder upon written request by Franchisee.

C.  Franchisee shall pay MAACO at the same time as the weekly royalty fee payments due under Paragraph 5A hereof a continuing weekly national marketing fee in the amount of seventy dollars ($70.00) or an amount equal to the then current national marketing fee being charged by MAACO to be used, in part, for national broadcast opportunities, national public relations and promotional efforts, and internet related advertising (including maintenance and updates to websites and social media) designed to promote the MAACO brand on a national level.  MAACO will notify Franchisee in writing of any increases to the national marketing fee.

D.  Franchisee shall pay MAACO at the same time as the weekly royalty fee payments due under Paragraph 5A hereof a continuing weekly digital marketing fee in the amount of seventy dollars ($70.00) or an amount equal to the then current digital marketing fee being charged by MAACO to be used for digital marketing efforts and future forms of electronic marketing or promotional tools or programs, including pay-per-click advertising and directory listing maintenance.  MAACO will notify Franchisee in writing of any increases in the digital marketing fee.

E.  MAACO shall be the owner of and shall secure the Remote Call Forward ("RCF") telephone number and listing for the Center.  Franchisee shall pay MAACO at the same time as the weekly royalty fee payments due under Paragraph 5A hereof a RCF telephone fee in the amount of five dollars ($5.00) or an amount equal to the then current telephone fee being charged by MAACO.  MAACO will notify Franchisee in writing of any increases in the telephone fee.  Franchisee shall not change telephone service providers for the Center without MAACO's approval.  MAACO shall have the right to control all print and online Yellow Page and internet search engine optimization ("SEO") advertising and telephone listings.  MAACO shall determine, at its sole discretion, the size of display advertisements and the type of advertisement to be placed in all Yellow Page and SEO advertisements.  Franchisee will also be obligated to reimburse MAACO for all telephone bills paid by MAACO with respect to the telephone and telephone number used by the Center upon receipt of invoice from MAACO, or, at the request of MAACO, Franchisee agrees to pay the telephone bill directly immediately upon

receipt thereof from MAACO or the telephone company. MAACO will place all Yellow Page and SEO advertising for Franchisee and other franchisees of the System. All Maaco Centers must have a display ad in the Yellow Page and SEO directory of the provider of its phone service. In addition to the payments made under Paragraph 6B above, Franchisee will be obligated to pay to MAACO the annual costs of such Yellow Page and SEO advertising which will be billed to Franchisee. Franchisee agrees to remit all such payments on a weekly basis in addition to the weekly payments referenced in Paragraph 6B above. In the event that more than one (1) franchisee shares the Yellow Page or SEO advertising the cost will be apportioned among all participating franchisees on an equal basis. If any payment to MAACO under this paragraph is past due, MAACO may require Franchisee to pay in full the annual cost of any Yellow Page and SEO advertising renewal upon demand by MAACO.

F. Franchisee acknowledges the need to aggressively advertise and promote his business on a local basis. Accordingly, Franchisee agrees to use his best efforts to promote the business of the Center through local advertising and promotion and agrees to expend such funds which may be necessary to accomplish this result.

G. All advertising by Franchisee in any medium shall be conducted in a dignified manner and shall conform to the standards and requirements prescribed by MAACO. Franchisee shall submit to MAACO for its prior approval, samples of all advertising and promotional plans and materials that Franchisee desires to use and that have not been prepared or previously approved by MAACO.

H. Franchisee will not develop, own or operate any website for the business franchised hereunder.

I. The telephone number owned and secured by MAACO shall be the only telephone number used in all advertising in any medium. Franchisee shall not own or use any toll free lines without the prior written approval of MAACO.

### 6.2 USE AND OWNERSHIP OF TELEPHONE NUMBERS

Certain advertising, including yellow pages, placed for a MAACO is placed using an RCF telephone number, or other such tracking mechanism that MAACO may use from time to time. This/these number(s) are established by us and will be directed to the primary local telephone number secured for Franchisee's Center. Franchisee may not publish, print, or otherwise use the RCF number(s), or other tracking mechanism used or sponsored by MAACO, are not to be published, printed or used by Franchisee or its Center in connection with any other business or any MAACO business related forms such as business cards, invoices, letterhead, etc. At no time does Franchisee have rights to or control of a MAACO Advertising RCF number. Only at such time when the MAACO franchise license associated with the location using the particular RCF number, or other tracking mechanism that may be used from time to time, is terminated, will Franchisee lose the use of the RCF number or such tracking mechanism

Franchisee must obtain local telephone service and establish it according to the guidelines set forth by MAACO. For Franchisee's advertising RCF number(s) to be established and for

Franchisee's Center to be included in MAACO coordinated advertising programs, Franchisee will be required to provide MAACO with the documentation showing the primary local telephone number and showing that it was established in the required manner. The primary local telephone number that Franchisee obtains will be the number used on business cards, letterhead, invoices and other business forms. This will also be the number to which Franchisee's advertising RCF number(s) will be directed. It is understood and agreed by Franchisee that the RCF program at some time may be replaced with other telephone tracking mechanisms that MAACO believes is more advanced than the current tracking mechanism and in that event Franchisee agrees to comply with the same or similar requirements that may be necessary to provide the same type of benefits that are now provided through the RCF number.

In addition, Franchisee agrees to sign such release and transfer documents as MAACO may require to authorize us to obtain the telephone numbers of Franchisee's Center upon any termination or expiration (without renewal) of this Agreement. If, during the Term, the telephone numbers for Franchisee's Center should be transferred to someone other than us, Franchisee will cooperate with us to ensure that they are returned to us.

Franchisee agrees not to place any restrictive codes on the telephone numbers for Franchisee's Center without MAACO's consent. Franchisee agrees not to terminate any such telephone numbers during the Term or do anything else that may directly or indirectly impede MAACO's ability to transfer or use those numbers upon any termination or expiration (without renewal) of this Agreement.

All telephone numbers and directory listings for Franchisee's Center are MAACO's property, and MAACO has the right to transfer, terminate or amend such telephone numbers and directory listings only on termination or expiration (without renewal) of this Agreement. If MAACO takes any action pursuant to this Section 6.2, the telephone company and all listing agencies may accept this Agreement as conclusive evidence of MAACO's exclusive rights to such telephone numbers and directory listings and as conclusive evidence of MAACO's authority to direct their amendment, termination or transfer, without any liability to Franchisee.

7.     **DUTIES OF FRANCHISEE**

A. Franchisee shall develop the Center in the manner prescribed by MAACO for a Maaco Center, including, without limitation, the implementation of the System as directed by MAACO, and shall use in the operation of the Center only those brands and types of equipment, inventory and supplies which meet MAACO's standards and specifications.

B. Before the Center opens, Franchisee and the majority investor in the franchise shall attend and successfully complete in MAACO's sole opinion, an initial training program prescribed by MAACO. The majority investor is defined as any signatory to this Agreement who has collateralized a loan for the business, guaranteed the lease, or guaranteed the mortgage on of the Center. MAACO shall provide and pay only for, training instructors, facilities, training materials, Franchisee's round trip transportation to and from the training site and lodging for the initial training program (if there are two or more persons named as Franchisee in this Agreement, MAACO will pay round trip transportation and lodging to and from the training for a maximum

of two (2) individuals including the majority investor if applicable).  All other expenses incurred in such initial training, including, without limitation, the cost of food, shall be borne by Franchisee.  In the event that Franchisee or the majority investor is unable to complete the initial training program to MAACO's satisfaction, MAACO shall have the right, upon written notice to Franchisee, to terminate this Agreement.

C.    Franchisee shall attend, at the request of MAACO, supplemental or refresher training programs, sales meetings, operations meetings, advertising meetings and conventions which may be offered by MAACO from time to time during the term of the franchise.  All expenses incurred in connection with additional training programs, sales meetings, operations meetings, advertising meetings and conventions as MAACO may reasonably require including, without limitation, the cost of travel, room, board and wages, shall be borne by Franchisee, and MAACO shall provide and pay only for training instructors and materials.

D.    Franchisee, at its sole expense, shall conduct ongoing training programs at the Center for employees.

E.    Franchisee shall maintain the Center in the highest degree of sanitation, repair and condition, and shall perform such periodic repainting, repairs to impaired equipment and replacement of obsolete signs as MAACO may reasonably direct.  At MAACO's request, which shall not be more often than once every five (5) years (and not more often than once every three (3) years for computer hardware and software), Franchisee shall refurbish the Center to conform to MAACO's then current public image, and shall remodel, redecorate and make such modifications to existing improvements as may be necessary.  Franchisee shall purchase any additional equipment and replace any obsolete equipment as MAACO may from time to time direct at Franchisee's expense.

F.    Franchisee shall render prompt, workmanlike, courteous and willing service to all customers of the Center and agrees to handle all customer complaints promptly and courteously.

G.    At MAACO's request, Franchisee shall provide MAACO with customer data and information that MAACO may require, including, but not limited to, customer invoices, customer's names, addresses and cash collected from customers.

H.    Franchisee will at all times actively promote the sale of Maaco's services and will use its best efforts to cultivate, develop and expand the business of the Center within the market.  Franchisee will do nothing which may, in MAACO's sole opinion, tend to discredit, dishonor, reflect adversely upon or in any manner injure the reputation of MAACO, Franchisee, any other franchisees or MAACO customers.

I.    Franchisee will offer all products and services that MAACO from time to time authorizes in writing for a Maaco Center.  Franchisee shall not offer or sell any other products or services without MAACO's written consent.

J.    Franchisee shall make all payments required under this Agreement in the manner and at the time prescribed in this Agreement.

K. Franchisee shall dedicate a telecommunications line for the sole purpose of supporting MAACO's computer system and shall subscribe to an Internet service provider approved by MAACO. At MAACO's election, Franchisee shall obtain telecommunications and computer infrastructure products required to support MAACO's then-current information technology systems.

L. Franchisee agrees to purchase from suppliers approved by MAACO, paint, abrasives and other products as MAACO may specify from time to time to ensure the integrity of the products used in the operation of Franchisee's Maaco Center and to support certain marketing programs that facilitate and support purchasing programs and arrangements negotiated by MAACO for the System.

M. If Franchisee, or an affiliate of Franchisee, acquires the location at any time during the term of the Agreement or any renewal, Franchisee, or its affiliate, shall provide MAACO with the option to purchase the property or enter into a lease with Franchisee, or its affiliate, upon termination or expiration of this Agreement, in a form satisfactory to MAACO.

N. Franchisee shall comply with all other requirements set forth in this Agreement.

## 8. WARRANTIES AND GUARANTEES

Recognizing the value of providing warranties and guarantees of the services performed hereunder to the customers of the System, and the importance of the standardization of the warranties and guarantees offered to the furtherance of the goodwill and public image of the System, the parties agree as follows:

A. MAACO has established uniform warranties and guarantees for the System and Franchisee agrees to provide to every customer of the Center on forms provided by MAACO, all warranties and guarantees as MAACO prescribes.

B. Franchisee agrees to honor valid customer claims presented under warranties and guarantees made by Franchisee and other MAACO franchisees without demanding reimbursement therefore from the customer. In the event that Franchisee honors a warranty or guarantee issued by another Maaco Center, Franchisee shall be reimbursed by the franchisee that originally performed the work. Such reimbursement shall be in an amount not to exceed MAACO's current nationally recommended warranty rates. In the event of a dispute between any customer of the Center and Franchisee over any warranty issued by the Center or any other Center, MAACO will evaluate the dispute and make a determination of the manner in which such dispute will be resolved and Franchisee shall be bound by this determination.

C. Franchisee agrees to reimburse any franchisee who satisfies any warranty or guarantee issued by Franchisee hereunder, in an amount as described in Paragraph 8B, hereof, within five (5) days after receipt of an invoice for such reimbursement. Franchisee authorizes MAACO to charge for warranty services performed by another Maaco Center on customer warranties issued by Franchisee, and to credit Franchisee for warranty services performed on

customer warranties issued by another Maaco Center, as MAACO determines to be appropriate from time to time for the national customer warranty program. Franchisee agrees to pay MAACO any net debit balances, and MAACO agrees to pay Franchisee any net credit balances, with respect to the national customer warranty program at such times and on such conditions as MAACO determines from time to time.

D.  Franchisee shall not issue or offer any other warranty or guarantee without MAACO's prior written approval.

## 9.  PROPRIETARY MARKS

A.  Franchisee's right to use the Proprietary Marks is derived solely from this Agreement and is limited to the conduct of business by Franchisee pursuant to and in compliance with this Agreement, including, but not limited to, standards and procedures prescribed by MAACO with respect to Franchisee's use of any Proprietary Mark in connection with an electronic address, domain name, website or search engine. Any unauthorized use of the Proprietary Marks by Franchisee, including, but not limited to, the unauthorized use by Franchisee of any Proprietary Mark as part of an electronic address, domain name, website or search engine, shall constitute an infringement of the rights of MAACO in and to the Proprietary Marks. Franchisee agrees that all usage of the Proprietary Marks and any goodwill established thereby shall inure to the exclusive benefit of MAACO. Franchisee acknowledges that this Agreement does not confer any goodwill or other interest in the Proprietary Marks upon Franchisee.

B.  Franchisee agrees that after termination or expiration of this Agreement he will not directly or indirectly at any time or in any manner identify himself or any business as a current or former Maaco Center or as otherwise associated with MAACO, or use in any manner or for any purpose the Proprietary Marks or any colorable imitation thereof.

C.  Franchisee agrees to operate, advertise and promote the Center under the trade and service mark "Maaco Collision Repair & Auto Painting," or other name prescribed by MAACO, provided that Franchisee shall identify himself as the owner and operator thereof in the manner prescribed by MAACO. Franchisee shall not use the Proprietary Marks as part of any corporate name or with any prefix, suffix or other modifying words, designs or symbols, or in any modified form, nor may Franchisee use the Proprietary Marks in connection with the sale of any unauthorized service or product or in any manner not expressly authorized by MAACO. Franchisee agrees to prominently display the Proprietary Marks on all sales invoices, stationery and other forms and materials designated by MAACO, and in the manner prescribed by MAACO, and to obtain such fictitious or assumed name registrations as may be required under applicable law.

D.  Franchisee shall promptly notify MAACO of any use by any person or legal entity other than MAACO or another of its franchisees of any Proprietary Marks, any colorable variation thereof, or any other mark in which MAACO has or claims a proprietary interest. Franchisee further agrees to notify MAACO promptly of any litigation instituted by any person or legal entity against MAACO or Franchisee involving the Proprietary Marks. In the event MAACO, in its sole discretion, undertakes the defense or prosecution of any litigation relating to

the Proprietary Marks, Franchisee agrees to execute any and all documents, and to render such assistance as may, in the opinion of MAACO's counsel, be reasonably necessary to carry out such defense or prosecution.

E.  MAACO may modify or discontinue Franchisee's use of any Proprietary Marks and/or substitute Proprietary Marks.  Franchisee agrees, at his/her expense, to comply with any such modification or discontinuance in accordance with time periods reasonably prescribed by MAACO.

## 10. CONFIDENTIAL OPERATING MANUAL

A.  In order to protect the reputation and goodwill of MAACO and to maintain uniform standards of operation under the Proprietary Marks, Franchisee shall operate the Center in accordance with MAACO's Confidential Operating Manual (the "Manual"), one copy of which will be supplied to Franchisee upon his or her arrival at training either in electronic or paper form.  The Manual contains mandatory and suggested standards, procedures, techniques and other items relating to the operation of a Maaco Center.  Franchisee must comply with all mandatory provisions of the Manual.

B.  Franchisee shall at all times treat the Manual, any other manuals created for or approved for use in the operation of the franchised business, and the information contained therein as confidential, and shall use all reasonable efforts to maintain such information as secret and confidential.  Franchisee shall not at any time, without MAACO's prior written consent, copy, duplicate, record or otherwise reproduce the foregoing materials, in whole or in part, nor otherwise make the same available to any unauthorized person.

C.  The Manual shall at all times remain the sole property of MAACO.

D.  MAACO may from time to time revise the contents of the Manual and Franchisee expressly agrees to comply with each new or changed standard; provided, however, that any such revision or modification will not materially change or alter the fundamentals of the System unless it is determined by MAACO that such changes are necessary or desirable to respond to changing market conditions or to enable its franchisees to compete more effectively in the market place.  The provisions of the Manual as modified from time to time shall constitute provisions of this Agreement as if fully set forth herein.  All references herein to this Agreement shall include the provisions of the Manual.

## 11. CONFIDENTIAL INFORMATION

Franchisee shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, persons, partnership, association or entity, any trade secrets or Confidential Information (defined further below), knowledge, or know-how concerning the methods of operation of a Maaco Center which may be communicated or disclosed to Franchisee, or of which Franchisee may be apprised, by virtue of Franchisee's operation under the terms of this Agreement.  Franchisee shall divulge such trade secrets and Confidential Information only to its employees who must have access to it in order to operate the

Center. "Confidential Information" shall include the Manual, MAACO's operating systems, MAACO's publications including Paintline, and such other documents, marketing/advertising strategies, media buying policies, methods, formats, specifications, standards, systems, procedures, sales and marketing techniques, knowledge and experience used in developing and operating Centers and all customer lists and customer information.

## 12. RECORDS AND REPORTS

A. During the term of this Agreement, Franchisee shall maintain and preserve, for at least seven (7) years from the dates of their preparation, full complete and accurate books, records and accounts in accordance with generally accepted accounting principles and in the form and manner prescribed by MAACO from time to time. Franchisee acknowledges that reporting this information to MAACO is critical to MAACO's operations and MAACO shall have the right to designate an accounting service or firm to compile all books, business records and reports prescribed from time to time by MAACO.

B. Franchisee shall report to MAACO, no later than noon on Tuesday of each week, the Center's weekly business figures for the preceding week, including without limitation, gross receipts and all related figures, as required by MAACO and in the manner specified by MAACO. MAACO shall have the right, in its sole discretion, to publish and disclose the Center's business figures in business publications distributed to its franchisees.

C. Franchisee shall, at its expense, submit to MAACO by the fifteenth (15th) day of each month, during the first twelve (12) months of the operation of the Center, an income statement and statement of cash flow for the Center for the preceding month and for the year-to-date and a balance sheet as of the end of such month. Within 120 days after the end of each calendar year, a year-end balance sheet and income statement and statement of cash flow of the Center for such year, reflecting all year-end adjustments and accruals, provided MAACO will not unreasonably withhold its consent to a request for an extension of time to provide such statements, and such other information as MAACO may require from time to time, including sales and income tax statements.

D. Franchisee shall submit to MAACO, for review or auditing, such other forms, reports, records, information and data as MAACO may reasonably request, including the Center's and Franchisee's (or if Franchisee is an entity, its owner's) personal income tax returns.

E. MAACO or its designated agents shall have the right at all reasonable times to examine, at its expense, the books, records and tax returns of Franchisee. MAACO shall also have the right, at any time, to have an independent audit made of the books of Franchisee. If any inspection or audit should reveal that any payments due MAACO have been understated in any report to MAACO, then Franchisee shall immediately pay to MAACO or its affiliates or subsidiaries the amount understated upon demand, plus interest from the date such amount was due until paid, at the rate specified in Paragraph 5F hereof. Additionally, if any inspection or audit should reveal that any payments due MAACO have been understated in any report to MAACO or if Franchisee fails to produce all books and records to be audited at the time specified by MAACO, Franchisee shall reimburse MAACO for any and all costs and expenses

connected with the inspection, any re-inspection or with the audit (including, without limitation, the charges of any independent accountant, attorneys' fees and travel expenses, room, board and compensation of MAACO employees). The foregoing remedies shall be in addition to any other remedies MAACO may have.

## 13. **INSURANCE**

A.      Franchisee shall purchase and at all times during the term of this Agreement shall maintain in full force and effect at his/her sole expense and for minimum policy limits prescribed from time to time by MAACO, public liability insurance, including but not limited to, employer's liability, garage liability, pollution liability, garagekeeper's legal liability, employment practices liability and commercial umbrella coverage against claims for bodily and personal injury, death and property damage caused by or occurring in conjunction with the operation of the Center and worker's insurance and other insurance required by law. MAACO may, upon written notice to Franchisee, increase the policy limits or minimum liability protection or require different or additional kinds of insurance to reflect inflation, changes in standards of liability, higher damage awards or other relevant changes in circumstances.

B.      All policies of insurance shall be issued by an insurance company having a policy holder's rating of A+ or better by A.M. Best Company and duly authorized to transact business in the state where the premises is located.

C.      All policies of insurance shall name MAACO as additional insured and any other party designated by MAACO. All such policies shall contain an endorsement which provides that only actual notice to insured, if an individual, or to any executive officer of insured, if a corporation or other entity, shall constitute knowledge of the insured. Franchisee shall furnish MAACO, any other named insureds and all other persons designated by MAACO, proof of insurance in the form Franchisor requires, indicating that all required insurance is in full force and effect and will not be terminated or changed without at least thirty (30) days prior written notice to MAACO of each such policy. Within five (5) days of any request by MAACO, Franchisee shall deliver a copy of all such insurance policies to MAACO for examination.

D.      Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as revised from time to time for all franchisees, MAACO shall have the right and authority (without, however, any obligation to do so), to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for MAACO's expenses in so acting, shall be payable by Franchisee immediately upon notice.

E.      Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by MAACO, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Paragraph 20 of this Agreement.

## 14. TRANSFERABILITY OF INTEREST

A. MAACO shall have the right to transfer or assign all or any part of its rights or obligations herein to any other person or legal entity.

B. Franchisee understands and acknowledges that the rights and duties set forth in the Agreement are personal to Franchisee. Accordingly, Franchisee shall not sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber any interest in this franchise or in Franchisee without the prior written consent of MAACO. Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of MAACO shall be null and void and shall constitute a material breach of this Agreement. MAACO shall not unreasonably withhold its consent to a transfer of any interest in the franchise or Franchisee, provided, however, that prior to the time of transfer, MAACO may, in its sole discretion, except in the case of a transfer to a corporation formed solely for the convenience of ownership, require that:

(1) All of Franchisee's accrued monetary obligations to MAACO and its affiliates and subsidiaries and all other outstanding obligations related to the Center shall have been satisfied;

(2) Franchisee shall have executed a general release in a form satisfactory to MAACO, of any and all claims against MAACO and its officers, directors, shareholders and employees, in their corporate and individual capacities;

(3) The transferee shall execute MAACO's then-current franchise agreement and pay MAACO a transfer fee of Fifteen Thousand Dollars ($15,000.00) which, when paid to MAACO, shall be deemed fully earned and nonrefundable;

(4) The transferee shall assume all warranty and guarantee work of the Franchisee;

(5) The transferee shall pay MAACO its then-current Initial Training and Opening Fee and shall complete the initial training program then in effect for franchisees;

(6) The transferee shall demonstrate to MAACO's satisfaction that he or she meets MAACO's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to conduct the business of the Center; and has adequate financial resources and capital to operate the Center;

(7) The transferee shall pay MAACO an initial advertising deposit of Ten Thousand Dollars ($10,000.00); provided MAACO shall have the right to increase the amount of such advertising deposit ten percent (10%) per year from the date of this Agreement to the date of any such transfer;

(8) In the event that as a result of MAACO's marketing/referral efforts an individual/transferee is identified or if the transferee has already executed a franchise

agreement with MAACO, Franchisee shall pay MAACO a sales commission in the amount of ten percent (10%) of the gross sales price of the Center or Twenty-Five Thousand Dollars ($25,000.00), whichever is greater, regardless of whether Franchisee has a listing with a third party broker;

(9) Franchisee shall pay to MAACO a transfer fee of Two Thousand Five Hundred and no/100 Dollars ($2,500.00).

(10)        Franchisee and transferee shall execute such other documents as may be reasonably required by MAACO; and

(11)    Franchisee or transferee shall complete the following Center refurbishing tasks, at Franchisee's expense, prior to MAACO's consent to any such transfer:

a.  Install MAACO's then-current merchandising system;

b.  Install MAACO's then-current exterior signage and trade dress;

c.  Complete general cleaning, fixing, repairing and painting of the Center;

d.  Complete maintenance service of the equipment (including, but not limited to, the oven, booth, mixing equipment and compressors);

e.  Replace equipment not repairable, as necessary; and

f.  Purchase hardware and software to operate MAACO's current shop management system.

C.  In the event the proposed transfer is to a corporation or other business entity formed solely for the convenience of ownership, MAACO's consent to such transfer may, in its sole discretion, be conditioned on the following requirements:

(1) The business entity transferee shall be newly organized and its charter or other organizational documents shall provide that its activities are confined exclusively to the operation of the Center;

(2) Franchisee shall own a majority interest in the transferee, shall not diminish his proportionate ownership interest in the transferee franchisee, except as may be required by law, and shall act as its principal executive officer;

(3) Each stock certificate or other certificate evidencing ownership of the Franchisee shall have conspicuously endorsed upon its face a statement in a form satisfactory to MAACO that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon assignment by this Agreement;

(4) All shareholders or others holding ownership interests in the transferee shall execute an agreement in the form prescribed by MAACO guaranteeing such corporation's obligations under this Agreement and agreeing to be bound jointly and severally by all provisions hereof; and

(5) The transferee shall agree to be bound by all of the provisions of this Agreement and to assume and discharge all of Franchisee's obligations hereunder.

D.  In the event of a proposed transfer, Franchisee agrees that MAACO shall have the right to make available to the transferee its complete file of Franchisee.

E.  If Franchisee is a corporation or other entity, the articles of incorporation, by-laws and other organizational documents shall recite that the issuance and transfer of any security is restricted by the terms of Paragraph 14 hereof and each stock certificate or other documents representing ownership interests shall have conspicuously endorsed upon its face a statement in a form satisfactory to MAACO that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon assignment by this Agreement.

F.  Upon the death or permanent incapacity of any person with an interest in the franchise or in Franchisee, the executor, administrator, personal representative or trustee of such person or entity shall transfer his or its interest to a third party approved by MAACO within a reasonable time, not to exceed 12 months from the date of death or permanent incapacity.  Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to the same conditions as any lifetime transfer.  If the heirs or beneficiaries of any such person are unable to meet the conditions in Paragraph 14 hereof, the executor, administrator, personal representative or trustee of the deceased or incapacitated franchisee shall have a reasonable time, not to exceed 12 months from the date of death or permanent incapacity,  to dispose of the deceased's or incapacitated person's interest in the franchise, which disposition shall be subject to all the terms and conditions for transfers contained in the Agreement.

G.  MAACO's consent to transfer of any interest in the franchise granted herein shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of MAACO's right to demand exact compliance with any of the terms of this Agreement by the transferee.

## 15. TERMINATION BY MAACO

A.  In addition to MAACO's right to terminate this Agreement as provided in Paragraph 2B hereof, MAACO may terminate this Agreement and the franchise by notice of termination to Franchisee upon the occurrence of any of the following events:

(1) Franchisee becomes insolvent, makes a general assignment for the benefit of creditors, is adjudicated as bankrupt, suffers temporary or permanent court appointed receivership of substantially all of its property or suffers the filing of a voluntary or involuntary bankrupt petition which is not dismissed within thirty (30) days after filing or is dissolved for any reason;

(2) Franchisee abandons or ceases to do business at the Center, or loses the right to possession of the Center or otherwise forfeits the right to do or transact business in the jurisdiction where the Center is located; however, if any loss of possession results from the governmental exercise of the power of eminent domain, or if, through no fault of Franchisee, the Center is damaged or destroyed by a disaster such that it cannot, in MAACO's judgment, reasonably be restored, then in either such event this Agreement shall not be terminated for that reason for ninety (90) days thereafter, provided Franchisee applies within that time for approval to relocate the Center, for the remainder of the term hereof, which approval shall not be unreasonably withheld;

(3) Arrest and/or conviction of Franchisee or any owner of Franchisee of certain felonies;

(4) Franchisee purports to transfer any rights or obligations under this Agreement to any third party without MAACO's prior written consent, contrary to the terms of Paragraph 14 of this Agreement;

(5) Franchisee fails to comply with the in term covenants in Paragraph 18 hereof;

(6) Franchisee discloses or divulges the contents of the Manual or other trade secret or Confidential Information provided Franchisee by MAACO contrary to Paragraphs 10 and 11 hereof;

(7) If an approved transfer is not effected within a reasonable time following Franchisee's death or permanent incapacity as required by Paragraph 14F hereof;

(8) A threat or danger to public health or safety results from the maintenance or operation of the Center;

(9) MAACO discovers that Franchisee made any material misrepresentation on or in connection with his application for the franchise;

(10)    MAACO receives repeated customer complaints about the Center;

(11)    Franchisee misrepresents or intentionally underreports the Center's business figures or gross receipt in reports submitted to MAACO;

(12)    Franchisee or the majority investor fails or is unable to complete the initial training program to the satisfaction of MAACO; or

(13)    Franchisee fails on two (2) or more occasions within any twelve (12) month period to comply with this Agreement, whether or not such failures to comply are corrected after notice thereof is delivered to Franchisee.

B.  MAACO shall have the further right to terminate this Agreement and the franchise by notice of termination to Franchisee, if Franchisee fails to comply with any other provision of this Agreement or any specification, standard or operating procedure prescribed by MAACO and does not correct such failure within seven (7) days if such failure relates to the use of the Proprietary Marks, fifteen (15) days if such failure relates to the payment of money by Franchisee pursuant to this Agreement or any other agreement between Franchisee and MAACO or its subsidiaries or affiliates, otherwise within thirty (30) days, after written notice of such failure to comply (which shall describe the action that Franchisee must take to correct same) is given to Franchisee.

C.  Termination is effective the date the notice of termination is mailed to Franchisee.

## 16. OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement:

A.  Franchisee shall immediately cease to operate the business franchised under this Agreement, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of MAACO.

B.  Franchisee shall immediately and permanently cease to use, by advertising or in any manner whatsoever, any equipment, confidential methods, procedures and techniques associated with the System; the trade and service mark "Maaco Auto Painting & Bodyworks" or "Maaco Collision Repair & Auto Painting," and any Proprietary Marks and distinctive forms, slogans, signs, symbols, or devices associated with the System.  In particular, Franchisee shall cease to use, without limitation, all signs, equipment, advertising materials, stationery, forms and any other articles which display the Proprietary Marks.

C.  Franchisee shall immediately stop accepting new customers using MAACO paperwork, shall complete all work-in-progress and deliver all motor vehicles to their owners, and shall provide MAACO with all customer data and customer lists in its possession.

D.  Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the name "Maaco" or any other service mark or trademark of MAACO, and to notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use all telephone numbers and all classified and other directory listings of the Center and, where applicable, to authorize same to transfer to MAACO or its affiliate all such numbers and directory listings.  Franchisee acknowledges that as between MAACO and Franchisee, MAACO has the sole rights to and interest in all telephone number and directory listings associated with any name or mark and, where applicable, authorizes MAACO to direct the telephone company and all listing agencies to transfer same to MAACO or its affiliate should Franchisee fail to do so, and the telephone company and all listing agencies shall accept such direction or this Agreement as conclusive of the exclusive rights of MAACO in such telephone numbers and directory listings and its authority to direct their transfer.  Franchisee shall be obligated to immediately pay all outstanding charges related to such telephone numbers upon termination or expiration.

E.  Franchisee shall make such modifications or alterations to the premises operated hereunder (including without limitation, ceasing all use of the telephone number) immediately upon termination or expiration of this Agreement as may be necessary to prevent the operation of any business thereon by himself or others in derogation of this Paragraph 16 and shall make such specific additional changes thereof as MAACO may reasonably request for that purpose.  In the event Franchisee fails to make such modifications, MAACO shall have the right to re-enter the premises and make such modifications or alterations to the premises.

F.  Franchisee shall promptly pay all sums owing to MAACO and its subsidiaries and affiliates.

G.  Franchisee shall immediately return to MAACO, at Franchisee's expense, all manuals, including the Manual, records, files, instructions, correspondence, all materials related to operating the franchised business including, without limitation, brochures, agreements, and any and all other materials relating to the operation of the Center in Franchisee's possession.

H.  Franchisee shall comply with the covenants contained in Paragraph 18 of this Agreement.

I.  Franchisee shall execute a general release in a form satisfactory to MAACO, of any and all claims against MAACO, its parents, affiliates and subsidiaries, together with all of their respective former, present and future officers, directors, shareholders, employees agents, attorneys, servants, representatives, heirs, successors, assigns and predecessors, in their individual and corporate capacities.

## 17. OPTION TO PURCHASE

A.  Upon termination or expiration of this Agreement, MAACO shall have the right for a period of sixty (60) days commencing on the date of termination or expiration to purchase from Franchisee the assets of the Center and obtain an assignment of Franchisee's lease for the premises of the Center, or if Franchisee owns the real property on which the Center is located, to purchase the property or enter into a lease with Franchisee for the premises of the Center.

B.  The purchase price for the assets of the Center shall be their fair market value exclusive of any goodwill, provided that MAACO may exclude from the purchased assets, any fixtures, equipment, signs, products or supplies that it has not theretofore approved as meeting quality or performance standards for Centers.  If MAACO and Franchisee are unable to agree on the fair market value, the fair market value shall be determined by an independent appraiser selected by both parties.

C.  The purchase price shall be paid in cash at the closing of the purchase, which shall take place no later than sixty (60) days after receipt by Franchisee of MAACO's notice of exercise of this option to purchase the assets, at which time Franchisee shall deliver instruments transferring to MAACO or its assignee:  (1) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances with all sales and other transfer taxes payable by

Franchisee; and (2) all licenses or permits which may be assigned or transferred. MAACO shall have the right to set off against and reduce the purchase price by any and all amounts owed by Franchisee to MAACO.

## 18. **COVENANTS**

A. Except as otherwise approved in writing by MAACO, Franchisee (or if Franchisee is more than one person, the person approved by MAACO) shall devote full time, energy and efforts to the management and operation of the Center. The Center shall at all times be managed and operated by Franchisee (or if Franchisee is more than one person, the person approved by MAACO). Franchisee conducting the day to day management and operation of the Center and the majority investor in the franchise shall attend and complete to MAACO's satisfaction the initial training program described in Paragraph 7E of this Agreement.

B. Franchisee covenants that during the term of this franchise, except as otherwise approved in writing by MAACO, Franchisee shall not directly or indirectly, for himself or herself, or through, on behalf of, or in conjunction with any person, persons, or legal entity:

(1) Divert or attempt to divert any business or customer of the business franchised hereunder to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks and the System.

(2) Employ or seek to employ any person who is at that time employed by MAACO or by any other franchisee of MAACO, or otherwise directly or indirectly induce such person to leave his or her employment, unless Franchisee obtains written approval from such person's employer.

(3) Own, maintain, engage in, be employed by, finance or make loans to, advise, assist, or have any interest in or relationship or association with any other business providing, in whole or in part, motor vehicle painting or body repair services or products.

C. Franchisee covenants that for a period of one (1) year from whichever of the following events occurs later: (i) the expiration or termination of this Agreement, regardless of the cause of termination; (ii) the date upon which Franchisee ceases to operate the Center; (iii) a transfer of this Agreement permitted under Paragraph 14; (iv) the date upon which Franchisee complies with this Paragraph 18C; or (v) a final arbitration or court order (after all appeals have been taken) concerning any of the foregoing or concerning the enforcement of this Paragraph 18C, Franchisee shall not either directly or indirectly, for himself or through, on behalf of, or in conjunction with any other person, persons, or legal entity:

(1) Do or engage in any act prescribed by Paragraphs 18B (1) and (2) of this Agreement, which are hereby incorporated by reference as if more fully set forth herein.

(2) Own, maintain, engage in, be employed by, finance or make loans to, advise, assist, or have any interest in or relationship or association with any business providing,

in whole or in part, motor vehicle painting or body repair services or products at the premises of the Center or within a radius of ten (10) miles of the Center or of any other Maaco Center or MAACO location (including MAACO retail stores).

D.  Franchisee understands and acknowledges that MAACO shall have the right to reduce the scope of any covenant set forth in Paragraph 18B and C, in this Agreement, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof, and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Paragraph 23 hereof.

E.  If any court or other tribunal having jurisdiction to determine the validity or enforceability of this Paragraph 18 determines that it would be invalid or unenforceable as written, then the provisions of Paragraph 18 shall be deemed to be modified to such extent or in such manner as necessary for such provisions to be valid and enforceable to the greatest extent possible.

F.  Franchisee acknowledges that any violation of Paragraph 18 would result in irreparable injury to MAACO for which no adequate remedy at law is available.

## 19.  TAXES, PERMITS AND INDEBTEDNESS

A.  Franchisee shall promptly pay when due all taxes levied or assessed by any federal, state or local tax authority, and any and all indebtedness incurred by Franchisee in the conduct of the business franchised hereunder.

B.  Franchisee shall comply with all federal, state and local laws, rules and regulations, and shall timely obtain any and all permits, certificates or licenses necessary for the full and proper conduct of the business franchised hereunder, including, without limitation, those related to hazardous waste storage and removal, licenses to do business, fictitious name registrations and sales tax permit clearance.  Franchisee shall comply with all laws and regulations relating to privacy and data protection, and must comply with any privacy policies or data protection and breach response policies MAACO may periodically establish.  Franchisee must notify MAACO immediately of any suspected data breach at or in connection with Franchisee's Center.

C.  Franchisee shall notify MAACO in writing within five (5) days of the commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect the operation or financial condition of the franchised business.

## 20.  INDEPENDENT CONTRACTOR AND INDEMNIFICATION

A.  It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them, that Franchisee shall be an independent contractor, and that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee or servant of the other for any purpose whatsoever.

B.  During the term of this Agreement and any extensions hereof, Franchisee expressly agrees to hold itself out to the public as an independent contractor operating the business pursuant to a franchise from MAACO.  Franchisee agrees to take such affirmative action as may be necessary to do so, including without limitation, exhibiting a notice of that fact in a conspicuous place in the franchised premises, the content of which MAACO reserves the right to specify.

C.  Franchisee is responsible for hiring all employees of the Center and is exclusively responsible for the terms of their employment, including their compensation and training. Franchisee is solely responsible for all employment decisions for the Center, including those related to hiring, firing, remuneration, personnel policies, benefits, record keeping, supervision and discipline, and regardless of whether Franchisee received advice from MAACO on these subjects.

D.  It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty or representation on MAACO's behalf, or to incur any debt or other obligation in MAACO's name, and that MAACO shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action, or by reason of any act or omission of Franchisee in its conduct of the franchised business or any claim or judgment arising therefrom against MAACO, including those related to Franchisee employees.  Franchisee shall indemnify and hold MAACO, its parents, affiliates and subsidiaries, together with all of their respective former, present and future  officers, directors, shareholders, employees, agents, attorneys, servants, representatives, heirs, successors, assigns and predecessors, harmless against any and all such claims arising directly or indirectly from, as a result of, or in connection with Franchisee's operation of the franchised business, including but not limited to, any claims relating to hazardous waste storage, removal or disposal, as well as the cost, including attorney's fees, of defending against them.

E.  Franchisee acknowledges and agrees that, except as provided under an applicable guarantee of performance, none of MAACO's past, present or future directors, officers, employees, incorporators, members, partners, stockholders, subsidiaries, affiliates, controlling parties, entities under common control, ownership or management, vendors, service providers, agents, attorneys or representatives will have any liability for (i) any of MAACO's obligations or liabilities relating to or arising from this Agreement, (ii) any claim against MAACO based on, in respect of, or by reason of, the relationship between Franchisee and MAACO, or (iii) any claim against MAACO based on any of MAACO's alleged unlawful act or omission.

21. **APPROVALS AND WAIVERS**

A.  Whenever this Agreement requires the prior approval or consent of MAACO, Franchisee shall make a timely written request to MAACO therefore, and such approval or consent shall be obtained in writing.

B.  MAACO makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by providing any waiver, approval, consent or

suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay or denial of any request therefore.

C.  No failure of MAACO to exercise any power reserved to it by this Agreement, or to insist upon strict compliance by Franchisee with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of MAACO's right to demand exact compliance with any of the terms herein.  Subsequent acceptance by MAACO of any payments due to it hereunder shall not be deemed to be a waiver by MAACO of any preceding breach by Franchisee of any terms, covenants or conditions of this Agreement.

## 22. **NOTICES**

A.  Franchisee acknowledges and agrees that exchanging information with MAACO by e-mail, electronic transmission and facsimile transmission is an important way to enable quick, effective and efficient communication.  To facilitate the use of e-mail, electronic transmission and facsimile transmission to exchange information, Franchisee authorizes during the term of this Agreement the transmission of e-mails, electronic and facsimile transmissions by MAACO, its employees, vendors and affiliates to Franchisee on matters pertaining to the business contemplated hereunder.  In order to implement the terms of this Paragraph, Franchisee agrees that:  (1) MAACO and its employees, vendors and affiliates are authorized to send e-mails, electronic transmissions and facsimile transmissions to those of Franchisee's employees as Franchisee may designate for the purpose of communicating with MAACO; (2) Franchisee will cause its officers, directors, and employees (as a condition of their employment or position with Franchisee) to give their consent (in an e-mail, electronically, or in a pen and paper writing, as MAACO may reasonably require) to MAACO's transmission of e-mails to those persons, and that such persons shall not opt-out, or otherwise ask to no longer receive e-mails from MAACO, its employees, vendors or affiliates during the time that such person works for or is affiliated with Franchisee; and (3) Franchisee will not opt-out, or otherwise ask to no longer receive e-mails from MAACO, its employees, vendors or affiliates during the term of this Agreement.

B.  Any and all notice required or permitted under this Agreement shall be in writing and shall be personally delivered or mailed by registered or certified mail to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

|  |  |
|---|---|
| Notice to MAACO: | Maaco Franchisor SPV LLC |
|  | 440 South Church Street |
|  | Suite 700 |
|  | Charlotte, North Carolina  28202 |
|  |  |
| Notices to Franchisee: | Novauto LLC |
|  | 23835 Spring Scent |
|  | San Antonio, Texas 78258 |
|  | Attn:  Jose Luis Novales Arellano |

Except for a notice of termination, as stated in Paragraph 15C, any notice by certified or registered mail shall be deemed to have been delivered two (2) business days from the date of mailing. The consent and authorization given in Paragraph 22A above shall not apply to the provision of notices under Paragraph 22B above unless the parties otherwise agree in a pen and paper writing signed by both parties.

## 23. ENTIRE AGREEMENT

This Agreement, the documents referred to herein, and the attachments hereto, if any, constitute the entire, full and complete agreement between MAACO and Franchisee concerning the subject matter hereof, and supersede all prior agreements, no other representations having induced Franchisee to execute this Agreement. No representations, inducements, promises or agreements, oral or otherwise, not embodied herein or attached hereto (unless of subsequent date) are made by either party, and none shall be of any force or effect with reference to this Agreement or otherwise. Notwithstanding the foregoing, nothing in this Agreement shall disclaim or require Franchisee to waive reliance on any representation that MAACO made in the most recent disclosure document (including its exhibits and amendments) that MAACO delivered to Franchisee or its representative, subject to any agreed-upon changes to the contract terms and conditions described in that disclosure document and reflected in this Agreement (including any riders or addenda signed at the same time as this Agreement). No amendment, change or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

## 24. SEVERABILITY AND CONSTRUCTION

A. Except as expressly provided to the contrary herein, each section, part, term and/or provision of this Agreement shall be considered severable; and if, for any reason, any section, part, term and/or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms and/or provisions of this Agreement as may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid sections, parts, terms and/or provisions shall be deemed not to be part of this Agreement.

B. If any applicable law or rule of any jurisdiction requires a greater prior notice of the termination of, or election not to renew this Agreement, or the taking of some other action with respect to such termination or election not to renew than is required hereunder, the prior notice of other action required by such law or rule shall be substituted for the notice or other requirements thereof.

C. Anything to the contrary herein notwithstanding, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than MAACO or Franchisee and such of their respective successors and assigns as may be contemplated by Paragraph 14 hereof, any rights or remedies under or by reason of this Agreement.

D.  Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which MAACO is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

E.  All captions in this Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.

F.  All references herein to gender and number shall be construed to include such other gender and number as the context may require, and all acknowledgements, promises, covenants, agreements and obligations herein made or undertaken by Franchisee shall be deemed jointly and severally undertaken by all parties hereto on behalf of Franchisee.

G.  This Agreement may be executed in counterparts, and each copy so executed shall be deemed an original.

## 25. ENFORCEMENT

A.  This Agreement takes effect upon its acceptance and execution by MAACO.  This Agreement shall be interpreted and construed under the laws of the State of North Carolina and any dispute between the parties shall be governed by and determined in accordance with the substantive law of the State of North Carolina, which laws shall prevail in the event of a conflict of law.

B.  Any action arising out of or relating to this Agreement shall be commenced, litigated, and concluded only in a state or federal court of general jurisdiction in the county or district where MAACO's principal offices are located, which as of the date of this Agreement is Charlotte, North Carolina.  Franchisee irrevocably submits to the jurisdiction of the state and federal courts located in Mecklenburg County, North Carolina, and irrevocably waives any objection he may have to either the jurisdiction or venue of such courts.  Franchisee further irrevocably agrees not to argue that any such court is an inconvenient forum or to request transfer of any such action to any other court.  MAACO, however, shall have the option of bringing any action to enforce the terms of this Agreement or prevent any actual or threatened breach of this Agreement in any court of competent jurisdiction and Franchisee consents to the entry of injunctive relief, including, without limitation, temporary restraining orders and/or preliminary and permanent injunctions without the requirement of bond, according to the equity rules in the jurisdiction in which such relief is sought.

C.  No right or remedy conferred upon or reserved to MAACO or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

D.  Nothing herein contained shall bar MAACO's right to obtain injunctive relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

E.  Franchisee agrees to pay MAACO its reasonable attorneys' fees and costs incurred in connection with any default by Franchisee under this Agreement.  If MAACO shall institute any action at law or in equity against Franchisee to secure or protect its rights hereunder or to enforce the terms of this Agreement, MAACO shall be entitled to recover, in addition to any judgment rendered in its favor, its reasonable attorneys' fees, costs, and court costs.

**FRANCHISEE ACKNOWLEDGES THAT THE SUCCESS OF THE CENTER INVOLVES RISKS AND IS DEPENDENT UPON:  (I) THE ABILITY AND ACUMEN OF FRANCHISEE AS AN INDEPENDENT BUSINESSPERSON; (II) FRANCHISEE'S FULL-TIME PARTICIPATION IN THE DAY-TO-DAY OPERATION OF THE CENTER; AND (III) FRANCHISEE'S IMPLEMENTATION OF THE SYSTEM. FRANCHISEE REPRESENTS AND WARRANTS THAT NEITHER MAACO NOR ANY PERSON OR ENTITY ACTING ON ITS BEHALF HAS PROVIDED ANY ASSURANCES OR MADE ANY REPRESENTATIONS OR WARRANTIES CONCERNING THE ACTUAL OR POTENTIAL SALES, COSTS, INCOME, PROFITS OR PROBABLE SUCCESS OF THE CENTER.  FRANCHISEE ACKNOWLEDGES THAT HE/SHE HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE MAACO FRANCHISE OPPORTUNITY.  FRANCHISEE HAS READ THE ABOVE FRANCHISE AGREEMENT AND UNDERSTANDS ITS TERMS.  FRANCHISEE WOULD NOT SIGN THIS FRANCHISE AGREEMENT IF FRANCHISEE DID NOT UNDERSTAND AND AGREE TO BE BOUND BY ITS TERMS.**

*[Signatures appear on following page.]*

**IN WITNESS WHEREOF**, the parties hereto have duly executed and delivered this Agreement as of <u>March 24, 2016</u>.

**NOVAUTO LLC**
a Texas limited liability company

By: <u>Jose Novales</u>
      6E1A7F6E00AC48E...
Authorized Representative

Date: <u>marzo 22, 2016</u>

<u>Jose Novales</u>
6E1A7F6E00AC48E...
Jose Luis Novales Arellano

**MAACO FRANCHISOR SPV LLC**
a Delaware limited liability company

By: <u>Jose Costa</u>
      440C4C5F7D6445F...
Authorized Representative

Date: <u>March 25, 2016</u>

Attest: <u>Sarah Workman</u>
        F15F7FF69B214AE...

# EXHIBIT B

# PERSONAL GUARANTY

This Personal Guaranty ("Guaranty" or "Agreement") is made and entered into as of March 24, 2016 by and among **Maaco Franchisor SPV LLC**, a Delaware limited liability company with its principal office located at 440 South Church Street, Suite 700, Charlotte, North Carolina 28202 ("MAACO"), **Jose Luis Novales Arellano**, a resident of the State of Texas ("Guarantor") and **Novauto LLC**, a(n) Texas limited liability company with its principal office located at 23835 Spring Scent, San Antonio, Texas 78258 ("Franchisee").

## BACKGROUND

A. On March 24, 2016, Guarantor, Franchisee and MAACO entered into two (2) MAACO Franchise Agreements (collectively the "Franchise Agreement") for the operation of two (2) Maaco Collision Repair & Auto Painting Centers identified as Center Nos. M2766 and M2767 (collectively the "Center").

B. Pursuant to the terms of the Franchise Agreement, Guarantor shall jointly and severally guaranty all of Franchisee's obligations under the Franchise Agreement pursuant to the terms of this Guaranty.

C. As a condition of and as an inducement to enter into the Franchise Agreement, Guarantor hereby agrees to unconditionally guaranty the performance of Franchisee in accordance with the terms and conditions of this Agreement.

## AGREEMENT

With the foregoing background incorporated by reference and in consideration of the mutual covenants contained in this Guaranty, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, and intending to be legally bound, the parties agree as follows:

1. Guarantor confirms and acknowledges that it has reviewed the Franchise Agreement and understands and is familiar with all of the terms and conditions contained in the Franchise Agreement.

2. Guarantor agrees to be jointly and severally bound by all of the terms and conditions of the Franchise Agreement. Guarantor further agrees to guaranty and act as surety for the performance of all of Franchisee's obligations, commitments, duties and liabilities under the Franchise Agreement. Without limiting the foregoing, Guarantor, severally, irrevocably and unconditionally guarantees to MAACO: (i) that Franchisee will pay all amounts to be paid and otherwise comply with all provisions of the Franchise Agreement or any other agreement with MAACO or its affiliates concerning the operation of the Center; and (ii) that if Franchisee defaults in making any such payments or complying with any such provisions, Guarantor shall, upon demand, pay all amounts due and owing MAACO and all damages that may arise as a result of any such noncompliance.

1

3.    In the enforcement of any of its rights against Guarantor, MAACO may proceed as if Guarantor were the primary obligor under the Franchise Agreement.  Guarantor waives any right to require MAACO to first proceed against Franchisee or to proceed against or exhaust any security (if any) held by MAACO or to pursue any other remedy available to it before proceeding against Guarantor.  No dealings between MAACO and Franchisee shall exonerate, release, discharge or in any way reduce the obligations of Guarantor hereunder, in whole or in part and in particular and without limiting the generality of the foregoing, MAACO may modify or amend the Franchise Agreement, grant any indulgence, release, postponement or extension of time, waive any term or condition of the Franchise Agreement, or any obligation of Franchisee, take or release any securities or other guarantees for the performance by Franchisee of any of its obligations, and otherwise deal with Franchisee as MAACO may see fit without affecting, lessening or limiting in any way the liability of Guarantor.  Notwithstanding any assignment for the general benefit of creditors or any bankruptcy or other act of insolvency by Franchisee, and notwithstanding any rejection, disaffirment or disclaimer of this Guaranty or the Franchise Agreement, Guarantor shall continue to be fully liable.

4.    This Guaranty shall be construed and interpreted in accordance with the laws of the State of North Carolina which laws shall control in the event of any conflict of law.

5.    This Guaranty contains the entire integrated agreement by Guarantor regarding the subject matter contained in this Guaranty, and may not be modified, changed or amended without the written consent of Guarantor and MAACO.

6.    This Guaranty shall be binding upon and inure to the benefit of MAACO's and Guarantor's heirs, successors and assigns.

7.    Guarantor agrees that as a shareholder of and an active participant in Franchisee, it will have a substantial relationship with MAACO at its corporate offices where MAACO's decision-making authority is vested and franchise operations are conducted and supervised. Therefore, any action arising out of or relating to this Guaranty shall be commenced, litigated and conducted only in any state or federal court of general jurisdiction in the county or district where MAACO'S corporate offices are located.  Guarantor irrevocably submits to the jurisdiction of such court and irrevocably waives any objection it may have to either the jurisdiction or venue of such court.  Guarantor further irrevocably agrees not to argue that any such court an inconvenient forum or to request transfer of any such action to any other court.

8.    In the event that MAACO retains the services of legal counsel to enforce the terms of this Guaranty, MAACO shall be entitled to recover all costs and expenses, including reasonable attorneys', expert and investigative fees, incurred in enforcing the terms of this Guaranty.

9.    Guarantor declare that the terms of this Guaranty have been completely read and are fully understood and voluntarily accepted by Guarantor, after having a reasonable opportunity to retain and confer with counsel.  This Guaranty is entered into after a full investigation by Guarantor, and Guarantor is not relying upon any statements or representations not contained in this Guaranty.

**I HAVE READ THE ABOVE GUARANTY AND UNDERSTAND ITS TERMS.  I WOULD NOT SIGN THIS GUARANTY IF I DID NOT UNDERSTAND AND AGREE TO BE BOUND BY ITS TERMS.**

**JOSE LUIS NOVALES ARELLANO**
an individual

*Jose Novales*
6E1A7F6E00AC48E...

Date: marzo 22, 2016

**MAACO FRANCHISOR SPV LLC**
a Delaware limited liability company

*Jose Costa*
By: 440C4C5F7D6445F...

Authorized Representative

Date: March 25, 2016

*Sarah Workman*
Attest: F15F7FF69B214AE...

3

# EXHIBIT C



# TEXAS ASSOCIATION OF REALTORS®
## COMMERCIAL LEASE

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2014

## Table of Contents

| No. | Paragraph Description | Pg. |
|---|---|---|
| 1. | Parties | 2 |
| 2. | Leased Premises | 2 |
| 3. | Term | 2 |
| | A. Term | 2 |
| | B. Delay of Occupancy | 2 |
| | C. Certificate of Occupancy | 3 |
| 4. | Rent and Expenses | |
| | A. Base Monthly Rent | 3 |
| | B. Additional Rent | 3 |
| | C. First Full Month's Rent | 3 |
| | D. Prorated Rent | 3 |
| | E. Place of Payment | 3 |
| | F. Method of Payment | 3 |
| | G. Late Charges | 4 |
| | H. Returned Checks | 4 |
| 5. | Security Deposit | 4 |
| 6. | Taxes | 4 |
| 7. | Utilities | 4 |
| 8. | Insurance | 5 |
| 9. | Use and Hours | 6 |
| 10. | Legal Compliance | 6 |
| 11. | Signs | 6 |
| 12. | Access By Landlord | 7 |
| 13. | Move-In Condition | 7 |
| 14. | Move-Out Condition | 7 |
| 15. | Maintenance and Repairs | 7 |
| | A. Cleaning | 7 |
| | B. Conditions Caused by a Party | 8 |
| | C. Repair & Maintenance Responsibility | 8 |
| | D. Repair Persons | 8 |
| | E. HVAC Service Contract | 9 |
| | F. Common Areas | 9 |
| | G. Notice of Repairs | 9 |
| | H. Failure to Repair | 9 |
| 16. | Alterations | 9 |
| 17. | Liens | 9 |
| 18. | Liability | 9 |
| 19. | Indemnity | 10 |
| 20. | Default | 10 |
| 21. | Abandonment, Interruption of Utilities, Removal of Property & Lockout | 10 |
| 22. | Holdover | 10 |
| 23. | Landlord's Lien & Security Interest | 11 |

| No. | Paragraph Description | Pg. |
|---|---|---|
| 24. | Assignment and Subletting | 11 |
| 25. | Relocation | 11 |
| 26. | Subordination | 11 |
| 27. | Estoppel Certificates & Financial Info. | 11 |
| 28. | Casualty Loss | 12 |
| 29. | Condemnation | 12 |
| 30. | Attorney's Fees | 12 |
| 31. | Representations | 12 |
| 32. | Brokers | 13 |
| 33. | Addenda | 13 |
| 34. | Notices | 13 |
| 35. | Special Provisions | 14 |
| 36. | Agreement of the Parties | 14 |

**ADDENDA & EXHIBITS** *(check all that apply)*

| | |
|---|---|
| ☒ | Exhibit A_____ |
| ☐ | Exhibit _____ |
| ☒ | Commercial Lease Addendum for Broker's Fee (TAR-2102) |
| ☒ | Commercial Lease Addendum for Expense Reimbursement (TAR-2103) |
| ☒ | Commercial Lease Addendum for Extension Option (TAR-2104) |
| ☐ | Commercial Lease Addendum for Percentage Rent (TAR-2106) |
| ☒ | Commercial Lease Addendum for Parking (TAR-2107) |
| ☒ | Commercial Landlord's Rules and Regulations (TAR-2108) |
| ☐ | Commercial Lease Guaranty (TAR-2109) |
| ☐ | Commercial Lease Addendum for Right of First Refusal (TAR-2105) |
| ☐ | Commercial Lease Addendum for Optional Space (TAR-2110) |
| ☒ | Commercial Lease Addendum for Construction (TAR-2111) or (TAR-2112) |
| ☒ | Commercial Lease Addendum for Contingencies (TAR-2119) |
| ☒ | Info about On-Site Sewer |
| ☐ | _____ |
| ☐ | _____ |
| ☒ | Information About Brokerage Services (TAR-2501) |

(TAR-2101) 4-1-14      Initialed for Identification by Landlord: _MW_ , and Tenant: _Jal_      Page 1 of 15

The Horn Company Real Estate Group, 15001 Old Bandera Rd Helotes, TX 78023
Phone: 210.887.8736      Fax: 210-525-8811      Mike Castillo      7490 N. FM 1560
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com



TEXAS ASSOCIATION OF REALTORS®
## COMMERCIAL LEASE
USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2014

1. **PARTIES:** The parties to this lease are:

   Landlord: <u>Villegas Masonry Inc</u> ; and

   Tenant: <u>Novauto LLC</u> .

2. **LEASED PREMISES:**

   A. Landlord leases to Tenant the following described real property, known as the "leased premises," along with all its improvements *(Check only one box)*:

   ☒ (1) <u>Multiple-Tenant Property</u>: Suite or Unit Number <u>7490A</u> containing approximately <u>11,200</u> square feet of rentable area in <u>Villegas Masonry Inc</u> *(project name)* at <u>7490 N. FM 1560</u> *(address)* in <u>SAN ANTONIO</u> *(city)*, <u>BEXAR</u> *(county)*, Texas, which is ~~legally~~ described on attached Exhibit <u>A</u> or as follows:

   ☐ (2) <u>Single-Tenant Property</u>: The real property containing approximately _____ square feet of rentable area at: _____ *(address)* in _____ *(city)*, _____ *(county)*, Texas, which is legally described on attached Exhibit _____ or as follows:

   B. If Paragraph 2A(1) applies:
   (1) "Property" means the building or complex in which the leased premises are located, inclusive of any common areas, drives, parking areas, and walks; and
   (2) the parties agree that the rentable area of the leased premises may not equal the actual or useable area within the leased premises and may include an allocation of common areas in the Property. The rentable area ☐ will ☒ will not be adjusted if re-measured.

3. **TERM:**

   A. <u>Term</u>: The term of this lease is <u>120</u> months and <u>0</u> days, commencing on:
   <u>July 1, 2016</u> (Commencement Date)
   and ending on <u>June 30, 2026</u> (Expiration Date).

   B. <u>Delay of Occupancy</u>: If Tenant is unable to occupy the leased premises on the Commencement Date because of construction on the leased premises to be completed by Landlord that is not substantially

7490 N. FM 1560
Commercial Lease concerning: <u>SAN ANTONIO,    78254</u>

complete or a prior tenant's holding over of the leased premises, Landlord will not be liable to Tenant for such delay and this lease will remain enforceable. In the event of such a delay, the Commencement Date will automatically be extended to the date Tenant is able to occupy the Property and the Expiration Date will also be extended by a like number of days, so that the length of this lease remains unchanged. If Tenant is unable to occupy the leased premises after the 90th day after the Commencement Date because of construction on the leased premises to be completed by Landlord that is not substantially complete or a prior tenant's holding over of the leased premises, Tenant may terminate this lease by giving written notice to Landlord before the leased premises become available to be occupied by Tenant and Landlord will refund to Tenant any amounts paid to Landlord by Tenant. This Paragraph 3B does not apply to any delay in occupancy caused by cleaning or repairs.

C.  <u>Certificate of Occupancy</u>: Unless the parties agree otherwise, Tenant is responsible for obtaining a certificate of occupancy for the leased premises if required by a governmental body.

## 4. RENT AND EXPENSES:

A.  <u>Base Monthly Rent</u>: On or before the first day of each month during this lease, Tenant will pay Landlord base monthly rent as described on attached Exhibit _____ or as follows:

| Dates | | Rate per rentable square foot *(optional)* | | Base Monthly |
|-------|-----|------------------|-----------------|--------------|
| From | To | $ Monthly Rate | $ Annual Rate | Rent $ |
| 07/01/2016 | 11/30/2016 | / rsf / month | / rsf / year | None |
| 12/01/2016 | 06/30/2019 | / rsf / month | / rsf / year | 7,500.00 |
| 07/01/2019 | 06/30/2021 | / rsf / month | / rsf / year | 7,725.00 |
| 07/01/2021 | 06/30/2023 | / rsf / month | / rsf / year | 7,956.75 |
| 07/01/2023 | 06/30/2025 | / rsf / month | / rsf / year | 8,195.45 |

B.  <u>Additional Rent</u>: In addition to the base monthly rent, Tenant will pay Landlord all other amounts, as provided by the attached *(Check all that apply.)*:
☐  (1) Commercial Lease Addendum for Expense Reimbursement (TAR-2103)
☐  (2) Commercial Lease Addendum for Percentage Rent (TAR-2106)
☐  (3) Commercial Lease Addendum for Parking (TAR-2107)
☐  (4) _____
All amounts payable under the applicable addenda are deemed to be "rent" for the purposes of this lease.

C.  <u>First Full Month's Rent</u>: The first full monthly rent is due on or before _____<u>Lease execution</u>_____
_____ .

D.  <u>Prorated Rent</u>: If the Commencement Date is on a day other than the first day of a month, Tenant will pay Landlord as prorated rent, an amount equal to the base monthly rent multiplied by the following fraction: the number of days from the Commencement Date to the first day of the following month divided by the number of days in the month in which this lease commences. The prorated rent is due on or before the Commencement Date.

E.  <u>Place of Payment</u>: Tenant will remit all amounts due to Landlord under this lease to the following person at the place stated or to such other person or place as Landlord may later designate in writing:

        Name: <u>Villegas Masonry Inc c/o The Horn Co</u>
        Address: <u>15001 Old Bandera Rd</u>
                  <u>Helotes, Tx 78023</u>

F.  <u>Method of Payment</u>: Tenant must pay all rent timely without demand, deduction, or offset, except as permitted by law or this lease. If Tenant fails to timely pay any amounts due under this lease or if any

7490 N. FM 1560
Commercial Lease concerning: SAN ANTONIO,  78254

check of Tenant is returned to Landlord by the institution on which it was drawn, Landlord after providing written notice to Tenant may require Tenant to pay subsequent amounts that become due under this lease in certified funds. This paragraph does not limit Landlord from seeking other remedies under this lease for Tenant's failure to make timely payments with good funds.

G. Late Charges: If Landlord does not actually receive a rent payment at the designated place of payment within 5 days after the date it is due, Tenant will pay Landlord a late charge equal to 10% of the amount due. In this paragraph, the mailbox is not the agent for receipt for Landlord. The late charge is a cost associated with the collection of rent and Landlord's acceptance of a late charge does not waive Landlord's right to exercise remedies under Paragraph 20.

H. Returned Checks: Tenant will pay $ 50.00 _____ for each check Tenant tenders to Landlord which is returned by the institution on which it is drawn for any reason, plus any late charges until Landlord receives payment.

## 5. SECURITY DEPOSIT:

A. Upon execution of this lease, Tenant will pay $ _____ 0 _____ to Landlord as a security deposit.

B. Landlord may apply the security deposit to any amounts owed by Tenant under this lease. If Landlord applies any part of the security deposit during any time this lease is in effect to amounts owed by Tenant, Tenant must, within 10 days after receipt of notice from Landlord, restore the security deposit to the amount stated.

C. Within 60 days after Tenant surrenders the leased premises and provides Landlord written notice of Tenant's forwarding address, Landlord will refund the security deposit less any amounts applied toward amounts owed by Tenant or other charges authorized by this lease.

## 6. TAXES: Unless otherwise agreed by the parties, Landlord will pay all real property ad valorem taxes assessed against the leased premises.

## 7. UTILITIES:

A. The party designated below will pay for the following utility charges to the leased premises and any connection charges for the utilities. *(Check all that apply.)*

|  | | N/A | Landlord | Tenant |
|---|---|:---:|:---:|:---:|
| (1) | Water | ☐ | ☐ | ☒ |
| (2) | Sewer | ☐ | ☐ | ☒ |
| (3) | Electric | ☐ | ☐ | ☒ |
| (4) | Gas | ☐ | ☐ | ☒ |
| (5) | Telephone | ☐ | ☐ | ☒ |
| (6) | Internet | ☐ | ☐ | ☒ |
| (7) | Cable | ☐ | ☐ | ☒ |
| (8) | Trash | ☐ | ☐ | ☒ |
| (9) | _____ | ☐ | ☐ | ☐ |
| (10) | All other utilities | ☐ | ☐ | ☒ |

B. The party responsible for the charges under Paragraph 7A will pay the charges directly to the utility service provider. The responsible party may select the utility service provider except that if Tenant selects the provider, any access or alterations to the Property or leased premises necessary for the utilities may be made only with Landlord's prior consent, which Landlord will not unreasonably withhold. If Landlord incurs any liability for utility or connection charges for which Tenant is responsible to pay

7490 N. FM 1560
Commercial Lease concerning: <u>SAN ANTONIO, 78254</u>

and Landlord pays such amount, Tenant will immediately upon written notice from Landlord reimburse Landlord such amount.

C. **Notice: Tenant should determine if all necessary utilities are available to the leased premises and are adequate for Tenant's intended use.**

D. After-Hours HVAC Charges: "HVAC services" means heating, ventilating, and air conditioning of the leased premises. *(Check one box only.)*

☐ (1) Landlord is obligated to provide the HVAC services to the leased premises only during the Property's operating hours specified under Paragraph 9C.

☐ (2) Landlord will provide the HVAC services to the leased premises during the operating hours specified under Paragraph 9C for no additional charge and will, at Tenant's request, provide HVAC services to the leased premises during other hours for an additional charge of $ _____ per hour. Tenant will pay Landlord the charges under this paragraph immediately upon receipt of Landlord's invoice. Hourly charges are charged on a half-hour basis. Any partial hour will be rounded up to the next half hour. Tenant will comply with Landlord's procedures to make a request to provide the additional HVAC services under this paragraph.

☒ (3) Tenant will pay for the HVAC services under this lease.

8. **INSURANCE:**

A. During all times this lease is in effect, Tenant must, at Tenant's expense, maintain in full force and effect from an insurer authorized to operate in Texas:
(1) public liability insurance naming Landlord as an additional insured with policy limits on an occurrence basis in a minimum amount of: *(check only (a) or (b) below)*
   ☒ (a) $1,000,000; or
   ☐ (b) $2,000,000.
   If neither box is checked the minimum amount will be $1,000,000.
(2) personal property damage insurance for the business operations being conducted in the leased premises and contents in the leased premises in an amount sufficient to replace such contents after a casualty loss; and
☒ (3) business interruption insurance sufficient to pay 12 months of rent payments;

B. Before the Commencement Date, Tenant must provide Landlord with a copy of insurance certificates evidencing the required coverage. If the insurance coverage is renewed or changes in any manner or degree at any time this lease is in effect, Tenant must, not later than 10 days after the renewal or change, provide Landlord a copy of an insurance certificate evidencing the renewal or change.

C. If Tenant fails to maintain the required insurance in full force and effect at all times this lease is in effect, Landlord may:
(1) purchase insurance that will provide Landlord the same coverage as the required insurance and Tenant must immediately reimburse Landlord for such expense; or
(2) exercise Landlord's remedies under Paragraph 20.

D. Unless the parties agree otherwise, Landlord will maintain in full force and effect insurance for: (1) fire and extended coverage in an amount to cover the reasonable replacement cost of the improvements of the Property; and (2) any public liability insurance in an amount that Landlord determines reasonable and appropriate.

E. If there is an increase in Landlord's insurance premiums for the leased premises or Property or its contents that is caused by Tenant, Tenant's use of the leased premises, or any improvements made by or for Tenant, Tenant will, for each year this lease is in effect, pay Landlord the increase immediately

7490 N. FM 1560
Commercial Lease concerning: SAN ANTONIO,    78254

after Landlord notifies Tenant of the increase. Any charge to Tenant under this Paragraph 8E will be equal to the actual amount of the increase in Landlord's insurance premium.

## 9. USE AND HOURS:

A. Tenant may use the leased premises for the following purpose and no other: MAACO Body and Paint

_____

B. Unless otherwise specified in this lease, Tenant will operate and conduct its business in the leased premises during business hours that are typical of the industry in which Tenant represents it operates.

C. The Property maintains operating hours of *(specify hours, days of week, and if inclusive or exclusive of weekends and holidays):* No limits from the landlord

_____

## 10. LEGAL COMPLIANCE:

A. Tenant may not use or permit any part of the leased premises or the Property to be used for:
(1) any activity which is a nuisance or is offensive, noisy, or dangerous;
(2) any activity that interferes with any other tenant's normal business operations or Landlord's management of the Property;
(3) any activity that violates any applicable law, regulation, zoning ordinance, restrictive covenant, governmental order, owners' association rules, tenants' association rules, Landlord's rules or regulations, or this lease;
(4) any hazardous activity that would require any insurance premium on the Property or leased premises to increase or that would void any such insurance;
(5) any activity that violates any applicable federal, state, or local law, including but not limited to those laws related to air quality, water quality, hazardous materials, wastewater, waste disposal, air emissions, or other environmental matters;
(6) the permanent or temporary storage of any hazardous material; or
(7) _____

B. "Hazardous material" means any pollutant, toxic substance, hazardous waste, hazardous material, hazardous substance, solvent, or oil as defined by any federal, state, or local environmental law, regulation, ordinance, or rule existing as of the date of this lease or later enacted.

C. Landlord does not represent or warrant that the leased premises or Property conform to applicable restrictions, zoning ordinances, setback lines, parking requirements, impervious ground cover ratio requirements, and other matters that may relate to Tenant's intended use. Tenant must satisfy itself that the leased premises may be used as Tenant intends by independently investigating all matters related to the use of the leased premises or Property. Tenant agrees that it is not relying on any warranty or representation made by Landlord, Landlord's agent, or any broker concerning the use of the leased premises or Property.

## 11. SIGNS:

A. Tenant may not post or paint any signs or place any decoration outside the leased premises or on the Property without Landlord's written consent. Landlord may remove any unauthorized sign or decorations, and Tenant will promptly reimburse Landlord for its cost to remove any unauthorized sign or decorations.

Commercial Lease concerning: <u>7490 N. FM 1560</u>
<u>SAN ANTONIO,      78254</u>

   B. Any authorized sign must comply with all laws, restrictions, zoning ordinances, and any governmental order relating to signs on the leased premises or Property. Landlord may temporarily remove any authorized sign to complete repairs or alterations to the leased premises or the Property.

   C. By providing written notice to Tenant before this lease ends, Landlord may require Tenant, upon move-out and at Tenant's expense, to remove, without damage to the Property or leased premises, any or all signs or decorations that were placed on the Property or leased premises by or at the request of Tenant. Any signs or decorations that Landlord does not require Tenant to remove and that are fixtures, become the property of the Landlord and must be surrendered to Landlord at the time this lease ends.

## 12. ACCESS BY LANDLORD:

   A. During Tenant's normal business hours Landlord may enter the leased premises for any reasonable purpose, including but not limited to purposes for repairs, maintenance, alterations, and showing the leased premises to prospective tenants or purchasers. Landlord may access the leased premises after Tenant's normal business hours if: (1) entry is made with Tenant's permission; or (2) entry is necessary to complete emergency repairs. Landlord will not unreasonably interfere with Tenant's business operations when accessing the leased premises.

   B. During the last ____90____ days of this lease, Landlord may place a "For Lease" or similarly worded sign on the leased premises.

## 13. MOVE-IN CONDITION: Tenant has inspected the leased premises and accepts it in its present (as-is) condition unless expressly noted otherwise in this lease or in an addendum. <u>Landlord and any agent have made no express or implied warranties as to the condition or permitted use of the leased premises or Property.</u>

## 14. MOVE-OUT CONDITION AND FORFEITURE OF TENANT'S PERSONAL PROPERTY:

   A. At the time this lease ends, Tenant will surrender the leased premises in the same condition as when received, except for normal wear and tear. Tenant will leave the leased premises in a clean condition free of all trash, debris, personal property, hazardous materials, and environmental contaminants.

   B. If Tenant leaves any personal property in the leased premises after Tenant surrenders possession of the leased premises, Landlord may: (1) require Tenant, at Tenant's expense, to remove the personal property by providing written notice to Tenant; or (2) retain such personal property as forfeited property to Landlord.

   C. "Surrender" means vacating the leased premises and returning all keys and access devices to Landlord. "Normal wear and tear" means deterioration that occurs without negligence, carelessness, accident, or abuse.

   D. By providing written notice to Tenant before this lease ends, Landlord may require Tenant, upon move-out and at Tenant's expense, to remove, without damage to the Property or leased premises, any or all fixtures that were placed on the Property or leased premises by or at the request of Tenant. Any fixtures that Landlord does not require Tenant to remove become the property of the Landlord and must be surrendered to Landlord at the time this lease ends.

## 15. MAINTENANCE AND REPAIRS:

   A. <u>Cleaning</u>: Tenant must keep the leased premises clean and sanitary and promptly dispose of all garbage in appropriate receptacles. ☐ Landlord ☒ Tenant will provide, at its expense, janitorial services to the leased premises that are customary and ordinary for the property type. Tenant will maintain any grease trap on the Property which Tenant uses, including but not limited to periodic

7490 N. FM 1560
Commercial Lease concerning: <u>SAN ANTONIO,   78254</u>

emptying and cleaning, as well as making any modification to the grease trap that may be necessary to comply with any applicable law.

B. <u>Repairs of Conditions Caused by a Party</u>: Each party must promptly repair a condition in need of repair that is caused, either intentionally or negligently, by that party or that party's guests, patrons, invitees, contractors or permitted subtenants.

C. <u>Repair and Maintenance Responsibility</u>: Except as otherwise provided by this Paragraph 15, the party designated below, at its expense, is responsible to maintain and repair the following specified items in the leased premises (if any). The specified items must be maintained in clean and good operable condition. If a governmental regulation or order requires a modification to any of the specified items, the party designated to maintain the item must complete and pay the expense of the modification. The specified items include and relate only to real property in the leased premises. Tenant is responsible for the repair and maintenance of its personal property. *(Check all that apply.)*

|  |  | N/A | Landlord | Tenant |
|---|---|---|---|---|
| (1) | Foundation, exterior walls, roof, and other structural components.... | ☐ | ☒ | ☐ |
| (2) | Glass and windows.................................................................. | ☐ | ☐ | ☒ |
| (3) | Fire protection equipment ....................................................... | ☐ | ☐ | ☒ |
| (4) | Fire sprinkler systems ............................................................ | ☒ | ☐ | ☐ |
| (5) | Exterior & overhead doors, including closure devices, molding, locks, and hardware ............................................................... | ☐ | ☐ | ☒ |
| (6) | Grounds maintenance, including landscaping and irrigation systems ................................................................................. | ☐ | ☐ | ☒ |
| (7) | Interior doors, including closure devices, frames, molding, locks, and hardware ........................................................................ | ☐ | ☐ | ☒ |
| (8) | Parking areas and walks.......................................................... | ☐ | ☐ | ☒ |
| (9) | Plumbing systems, drainage systems and sump pumps .................. | ☐ | ☒ | ☐ |
| (10) | Electrical systems, mechanical systems ......................................... | ☐ | ☐ | ☒ |
| (11) | Ballast and lamp replacement .................................................. | ☐ | ☐ | ☒ |
| (12) | Heating, Ventilation and Air Conditioning (HVAC) systems .............. | ☐ | ☐ | ☒ |
| (13) | HVAC system replacement ........................................................ | ☐ | ☒ | ☐ |
| (14) | Signs and lighting: ................................................................. |  |  |  |
|  | (a) Pylon............................................................................... | ☐ | ☐ | ☒ |
|  | (b) Facia............................................................................... | ☐ | ☐ | ☒ |
|  | (c) Monument........................................................................ | ☐ | ☐ | ☒ |
|  | (d) Door/Suite........................................................................ | ☐ | ☐ | ☒ |
|  | (e) Other: _____ ............ | ☐ | ☐ | ☐ |
| (15) | Extermination and pest control, excluding wood-destroying insects. | ☐ | ☐ | ☒ |
| (16) | Fences and Gates ................................................................. | ☐ | ☒ | ☐ |
| (17) | Storage yards and storage buildings........................................... | ☐ | ☐ | ☒ |
| (18) | Wood-destroying insect treatment and repairs .............................. | ☐ | ☐ | ☒ |
| (19) | Cranes and related systems...................................................... | ☒ | ☐ | ☐ |
| (20) | <u>1 car lift</u> | ☐ | ☐ | ☒ |
| (21) | <u>Septic System and Water Well</u> | ☐ | ☒ | ☐ |
| (22) | All other items and systems...................................................... | ☐ | ☐ | ☐ |

D. <u>Repair Persons</u>: Repairs must be completed by trained, qualified, and insured repair persons.

7490 N. FM 1560
Commercial Lease concerning: SAN ANTONIO, 78254

E. **HVAC Service Contract:** If Tenant maintains the HVAC system under Paragraph 15C(12), Tenant ☒ is ☐ is not required to maintain, at its expense, a regularly scheduled maintenance and service contract for the HVAC system. The maintenance and service contract must be purchased from a HVAC maintenance company that regularly provides such contracts to similar properties. If Tenant fails to maintain a required HVAC maintenance and service contract in effect at all times during this lease, Landlord may do so and Tenant will reimburse Landlord for the expense of such maintenance and service contract or Landlord may exercise Landlord's remedies under Paragraph 20.

F. **Common Areas:** Landlord will maintain any common areas in the Property in a manner as Landlord determines to be in the best interest of the Property. Landlord will maintain any elevator and signs in the common area. Landlord may change the size, dimension, and location of any common areas, provided that such change does not materially impair Tenant's use and access to the leased premises. Tenant has the non-exclusive license to use the common areas in compliance with Landlord's rules and regulations. Tenant may not solicit any business in the common areas or interfere with any other person's right to use the common areas. This paragraph does not apply if Paragraph 2A(2) applies.

G. **Notice of Repairs:** Tenant must promptly notify Landlord of any item that is in need of repair and that is Landlord's responsibility to repair. All requests for repairs to Landlord must be in writing.

H. **Failure to Repair:** Landlord must make a repair for which Landlord is responsible within a reasonable period of time after Tenant provides Landlord written notice of the needed repair. If Tenant fails to repair or maintain an item for which Tenant is responsible within 10 days after Landlord provides Tenant written notice of the needed repair or maintenance, Landlord may: (1) repair or maintain the item, without liability for any damage or loss to Tenant, and Tenant must immediately reimburse Landlord for the cost to repair or maintain; or (2) exercise Landlord's remedies under Paragraph 20.

16. **ALTERATIONS:**

A. Tenant may not alter (including making any penetrations to the roof, exterior walls or foundation), improve, or add to the Property or the leased premises without Landlord's written consent. Landlord will not unreasonably withhold consent for the Tenant to make reasonable non-structural alterations, modifications, or improvements to the leased premises.

B. Tenant may not alter any locks or any security devices on the Property or the leased premises without Landlord's consent. If Landlord authorizes the changing, addition, or rekeying of any locks or other security devices, Tenant must immediately deliver the new keys and access devices to Landlord.

C. If a governmental order requires alteration or modification to the leased premises, the party obligated to maintain and repair the item to be modified or altered as designated in Paragraph 15 will, at its expense, modify or alter the item in compliance with the order and in compliance with Paragraphs 16A and 17.

D. Any alterations, improvements, fixtures or additions to the Property or leased premises installed by either party during the term of this lease will become Landlord's property and must be surrendered to Landlord at the time this lease ends, except for those fixtures Landlord requires Tenant to remove under Paragraph 11 or 14 or if the parties agree otherwise in writing.

17. **LIENS:** Tenant may not do anything that will cause the title of the Property or leased premises to be encumbered in any way. If Tenant causes a lien to be filed against the Property or leased premises, Tenant will within 20 days after receipt of Landlord's demand: (1) pay the lien and have the lien released of record; or (2) take action to discharge the lien. Tenant will provide Landlord a copy of any release Tenant obtains pursuant to this paragraph.

18. **LIABILITY:** To the extent permitted by law, Landlord is NOT responsible to Tenant or Tenant's employees, patrons, guests, or invitees for any damages, injuries, or losses to person or property caused by:

7490 N. FM 1560
Commercial Lease concerning: SAN ANTONIO,   78254

indemnify Landlord and any prospective tenants for any and all damages caused by the holdover. Rent for any holdover period will be 150% of the base monthly rent plus any additional rent calculated on a daily basis and will be immediately due and payable daily without notice or demand.

**23. LANDLORD'S LIEN AND SECURITY INTEREST:** To secure Tenant's performance under this lease, Tenant grants to Landlord a lien and security interest against all of Tenant's nonexempt personal property that is in the leased premises or on the Property. This lease is a security agreement for the purposes of the Uniform Commercial Code. Landlord may file a financing statement to perfect Landlord's security interest under the Uniform Commercial Code.

**24. ASSIGNMENT AND SUBLETTING:** Landlord may assign this lease to any subsequent owner of the Property. Tenant may not assign this lease or sublet any part of the leased premises without Landlord's written consent. An assignment of this lease or subletting of the leased premises without Landlord's written consent is voidable by Landlord. If Tenant assigns this lease or sublets any part of the leased premises, Tenant will remain liable for all of Tenant's obligations under this lease regardless if the assignment or sublease is made with or without the consent of Landlord.

**25. RELOCATION:**

☐ A. By providing Tenant with not less than 90 days advanced written notice, Landlord may require Tenant to relocate to another location in the Property, provided that the other location is equal in size or larger than the leased premises then occupied by Tenant and contains similar leasehold improvements. Landlord will pay Tenant's reasonable out-of-pocket moving expenses for moving to the other location. "Moving expenses" means reasonable expenses payable to professional movers, utility companies for connection and disconnection fees, wiring companies for connecting and disconnecting Tenant's office equipment required by the relocation, and printing companies for reprinting Tenant's stationery and business cards. A relocation of Tenant will not change or affect any other provision of this lease that is then in effect, including rent and reimbursement amounts, except that the description of the suite or unit number will automatically be amended.

☒ B. Landlord may not require Tenant to relocate to another location in the Property without Tenant's prior consent.

**26. SUBORDINATION:**

A. This lease and Tenant's leasehold interest are and will be subject, subordinate, and inferior to:
  (1) any lien, encumbrance, or ground lease now or hereafter placed on the leased premises or the Property that Landlord authorizes;
  (2) all advances made under any such lien, encumbrance, or ground lease;
  (3) the interest payable on any such lien or encumbrance;
  (4) any and all renewals and extensions of any such lien, encumbrance, or ground lease;
  (5) any restrictive covenant affecting the leased premises or the Property; and
  (6) the rights of any owners' association affecting the leased premises or Property.

B. Tenant must, on demand, execute a subordination, attornment, and non-disturbance agreement that Landlord may request that Tenant execute, provided that such agreement is made on the condition that this lease and Tenant's rights under this lease are recognized by the lien-holder.

**27. ESTOPPEL CERTIFICATES & FINANCIAL INFORMATION:**

A. Within 10 days after receipt of a written request from Landlord, Tenant will execute and deliver to Landlord an estoppel certificate that identifies the terms and conditions of this lease.

7490 N. FM 1560
Commercial Lease concerning: <u>SAN ANTONIO,    78254</u>

A. <u>an act, omission, or neglect of: Tenant; Tenant's agent; Tenant's guest; Tenant's employees; Tenant's patrons; Tenant's invitees; or any other tenant on the Property;</u>

B. <u>fire, flood, water leaks, ice, snow, hail, winds, explosion, smoke, riot, strike, interruption of utilities, theft, burglary, robbery, assault, vandalism, other persons, environmental contaminants, or other occurrences or casualty losses.</u>

19. **INDEMNITY:** <u>Each party will indemnify, defend, and hold the other party harmless from any property damage, personal injury, suits, actions, liabilities, damages, cost of repairs or service to the leased premises or Property, or any other loss caused, negligently or otherwise, by that party or that party's employees, patrons, guests, or invitees.</u>

20. **DEFAULT:**

A. If Landlord fails to comply with this lease within 30 days after Tenant notifies Landlord of Landlord's failure to comply, Landlord will be in default and Tenant may seek any remedy provided by law. If, however, Landlord's non-compliance reasonably requires more than 30 days to cure, Landlord will not be in default if the cure is commenced within the 30-day period and is diligently pursued.

B. If Landlord does not actually receive at the place designated for payment any rent due under this lease within 5 days after it is due, Tenant will be in default. If Tenant fails to comply with this lease for any other reason within 10 days after Landlord notifies Tenant of its failure to comply, Tenant will be in default.

C. If Tenant is in default, Landlord may, with at least 3 days written notice to Tenant: (i) terminate this lease, or (ii) terminate Tenant's right to occupy the leased premises without terminating this lease and may accelerate all rents which are payable during the remainder of this lease or any renewal period. Landlord will attempt to mitigate any damage or loss caused by Tenant's breach by using commercially reasonable means. If Tenant is in default, Tenant will be liable for:
   (1) any lost rent;
   (2) Landlord's cost of reletting the leased premises, including brokerage fees, advertising fees, and other fees necessary to relet the leased premises;
   (3) repairs to the leased premises for use beyond normal wear and tear;
   (4) all Landlord's costs associated with eviction of Tenant, such as attorney's fees, court costs, and prejudgment interest;
   (5) all Landlord's costs associated with collection of rent such as collection fees, late charges, and returned check charges;
   (6) cost of removing any of Tenant's equipment or fixtures left on the leased premises or Property;
   (7) cost to remove any trash, debris, personal property, hazardous materials, or environmental contaminants left by Tenant or Tenant's employees, patrons, guests, or invitees in the leased premises or Property;
   (8) cost to replace any unreturned keys or access devices to the leased premises, parking areas, or Property; and
   (9) any other recovery to which Landlord may be entitled under this lease or under law.

21. **ABANDONMENT, INTERRUPTION OF UTILITIES, REMOVAL OF PROPERTY, AND LOCKOUT:** Chapter 93 of the Texas Property Code governs the rights and obligations of the parties with regard to: (a) abandonment of the leased premises; (b) interruption of utilities; (c) removal of Tenant's property; and (d) "lock-out" of Tenant.

22. **HOLDOVER:** If Tenant fails to vacate the leased premises at the time this lease ends, Tenant will become a tenant-at-will and must vacate the leased premises immediately upon receipt of demand from Landlord. No holding over by Tenant, with or without the consent of Landlord, will extend this lease. Tenant will

7490 N. FM 1560
Commercial Lease concerning: SAN ANTONIO,    78254

B. Within 30 days after receipt of a written request from Landlord, Tenant will provide to Landlord Tenant's current financial information (balance sheet and income statement). Landlord may request the financial information no more frequently than once every 12 months.

## 28. CASUALTY LOSS:

A. Tenant must immediately notify Landlord of any casualty loss in the leased premises. Within 20 days after receipt of Tenant's notice of a casualty loss, Landlord will notify Tenant if the leased premises are less than or more than 50% unusable, on a per square foot basis, and if Landlord can substantially restore the leased premises within 120 days after Tenant notifies Landlord of the casualty loss.

B. If the leased premises are less than 50% unusable and Landlord can substantially restore the leased premises within 120 days after Tenant notifies Landlord of the casualty, Landlord will restore the leased premises to substantially the same condition as before the casualty. If Landlord fails to substantially restore within the time required, Tenant may terminate this lease.

C. If the leased premises are more than 50% unusable and Landlord can substantially restore the leased premises within 120 days after Tenant notifies Landlord of the casualty, Landlord may: (1) terminate this lease; or (2) restore the leased premises to substantially the same condition as before the casualty. If Landlord chooses to restore and does not substantially restore the leased premises within the time required, Tenant may terminate this lease.

D. If Landlord notifies Tenant that Landlord cannot substantially restore the leased premises within 120 days after Tenant notifies Landlord of the casualty loss, Landlord may: (1) choose not to restore and terminate this lease; or (2) choose to restore, notify Tenant of the estimated time to restore, and give Tenant the option to terminate this lease by notifying Landlord within 10 days.

E. If this lease does not terminate because of a casualty loss, rent will be reduced from the date Tenant notifies Landlord of the casualty loss to the date the leased premises are substantially restored by an amount proportionate to the extent the leased premises are unusable.

## 29. CONDEMNATION: 
If after a condemnation or purchase in lieu of condemnation the leased premises are totally unusable for the purposes stated in this lease, this lease will terminate. If after a condemnation or purchase in lieu of condemnation the leased premises or Property are partially unusable for the purposes of this lease, this lease will continue and rent will be reduced in an amount proportionate to the extent the leased premises are unusable. Any condemnation award or proceeds in lieu of condemnation are the property of Landlord and Tenant has no claim to such proceeds or award. Tenant may seek compensation from the condemning authority for its moving expenses and damages to Tenant's personal property.

## 30. ATTORNEY'S FEES: 
Any person who is a prevailing party in any legal proceeding brought under or related to the transaction described in this lease is entitled to recover prejudgment interest, reasonable attorney's fees, and all other costs of litigation from the nonprevailing party.

## 31. REPRESENTATIONS:

A. Tenant's statements in this lease and any application for rental are material representations relied upon by Landlord. Each party signing this lease represents that he or she is of legal age to enter into a binding contract and is authorized to sign the lease. If Tenant makes any misrepresentation in this lease or in any application for rental, Tenant is in default.

B. Landlord is not aware of any material defect on the Property that would affect the health and safety of an ordinary person or any environmental hazard on or affecting the Property that would affect the

Commercial Lease concerning: 7490 N. FM 1560
SAN ANTONIO,    78254

health or safety of an ordinary person, except: _____

_____ .

C. Each party and each signatory to this lease represents that: (1) it is not a person named as a Specially Designated National and Blocked Person as defined in Presidential Executive Order 13224; (2) it is not acting, directly or indirectly, for or on behalf of a Specially Designated and Blocked Person; and (3) is not arranging or facilitating this lease or any transaction related to this lease for a Specially Designated and Blocked Person. Any party or any signatory to this lease who is a Specially Designated and Blocked person will indemnify and hold harmless any other person who relies on this representation and who suffers any claim, damage, loss, liability or expense as a result of this representation.

## 32. BROKERS:

A. The brokers to this lease are:

| Principal Broker: The Horn Real Estate Group | Cooperating Broker: Keller Williams Commercial |
|---|---|
| Agent: MIKE CASTILLO | Agent: _____ |
| Address: 15001 Old Bandera Rd | Address: _____ |
| Helotes, TX  78023-3718 | _____ |
| Phone & Fax: (210) 695-5000 | Phone & Fax: _____ |
| E-mail: mikecastillo@thehornco.com | E-mail: _____ |
| License No.: 9000241 | License No.: _____ |

Principal Broker: *(Check only one box)*
☒ represents Landlord only.
☐ represents Tenant only.
☐ is an intermediary between Landlord and Tenant.

Cooperating Broker represents Tenant.

B. Fees:

☒ (1) Principal Broker's fee will be paid according to: *(Check only one box)*.
   ☐ (a) a separate written commission agreement between Principal Broker and:
       ☐ Landlord ☐ Tenant.
   ☒ (b) the attached Commercial Lease Addendum for Broker's Fee (TAR-2102).

☐ (2) Cooperating Broker's fee will be paid according to: *(Check only one box)*.
   ☐ (a) a separate written commission agreement between Cooperating Broker and:
       ☐ Principal Broker ☐ Landlord ☐ Tenant.
   ☐ (b) the attached Commercial Lease Addendum for Broker's Fee (TAR-2102).

## 33. ADDENDA: Incorporated into this lease are the addenda, exhibits and other information marked in the Addenda and Exhibit section of the Table of Contents. If Landlord's Rules and Regulations are made part of this lease, Tenant agrees to comply with the Rules and Regulations as Landlord may, at its discretion, amend from time to time.

## 34. NOTICES: All notices under this lease must be in writing and are effective when hand-delivered, sent by mail, or sent by facsimile transmission to:

Landlord at: Villegas Masonry Inc c/o The Horn Co
Address: 15001 Old Bandera Rd Helotes,Tx 78023

(TAR-2101) 4-1-14        Initialed for Identification by Landlord: _MV_____ , and Tenant: __JW___        Page 13 of 15

Commercial Lease concerning: 7490 N. FM 1560 SAN ANTONIO,   78254 _____

Phone: (210) 695-5000 _____ Fax: (210) 695-9999 _____
and a copy to: _____
Address: _____
Phone: _____ Fax: _____
☒ Landlord also consents to receive notices by e-mail at: mikecastillo@thehornco.com _____

Tenant at the leased premises,
and a copy to: _____
Address: _____
Phone: _____ Fax: _____
☐ Tenant also consents to receive notices by e-mail at: _____

## 35. SPECIAL PROVISIONS:

1. Rent - July 1, 2025 - June 30, 2026     $8,441.32 per month.
2. Tenant to pay rent for the month of July 2020 at lease execution, $7725.00.
3. Landlord has the option of using the well and septic system for the back property.
4. Repair Responsibility: If Landlord is responsible for an item or system in this lease but the repair is due to Tenant neglect or fault, then the Tenant will have the responsibility to pay for the repair.
5. Tenant to deliver Property back to Landlord upon termination of current lease terms with all systems and items in good working condition.
6. Landlord to deliver property to Tenant with all systems and items in good working condition.
7.11 a - Signage - Landlord will allow for MAACO signage and temporary professional promotional signage as long as it complies to local ordinances.
8. Landlord to install perimeter fence to identify Tenant Lease premise.

## 36. AGREEMENT OF PARTIES:

A. Entire Agreement: This lease contains the entire agreement between Landlord and Tenant and may not be changed except by written agreement.

B. Binding Effect: This lease is binding upon and inures to the benefit of the parties and their respective heirs, executors, administrators, successors, and permitted assigns.

C. Joint and Several: All Tenants are jointly and severally liable for all provisions of this lease. Any act or notice to, or refund to, or signature of, any one or more of the Tenants regarding any term of this lease, its renewal, or its termination is binding on all Tenants.

D. Controlling Law: The laws of the State of Texas govern the interpretation, performance, and enforcement of this lease.

E. Severable Clauses: If any clause in this lease is found invalid or unenforceable by a court of law, the remainder of this lease will not be affected and all other provisions of this lease will remain valid and enforceable.

F. Waiver: Landlord's delay, waiver, or non-enforcement of acceleration, contractual or statutory lien, rental due date, or any other right will not be deemed a waiver of any other or subsequent breach by Tenant or any other term in this lease.

7490 N. FM 1560
Commercial Lease concerning: SAN ANTONIO,    78254

G. <u>Quiet Enjoyment</u>: Provided that Tenant is not in default of this lease, Landlord covenants that Tenant will enjoy possession and use of the leased premises free from material interference.

H. <u>Force Majeure</u>: If Landlord's performance of a term in this lease is delayed by strike, lock-out, shortage of material, governmental restriction, riot, flood, or any cause outside Landlord's control, the time for Landlord's performance will be abated until after the delay.

I. <u>Time</u>: Time is of the essence. The parties require strict compliance with the times for performance.

**Brokers are not qualified to render legal advice, property inspections, surveys, engineering studies, environmental assessments, tax advice, or compliance inspections. The parties should seek experts to render such services. READ THIS LEASE CAREFULLY. If you do not understand the effect of this Lease, consult your attorney BEFORE signing.**

Landlord:<u>Villegas Masonry Inc</u>              Tenant: Novauto LLC

By: <u>Moises Villegas</u>                       By: <u>Jose Novales</u>

By (signature): _____            By (signature): _____
Printed Name:<u>Moises Villegas</u>           Printed Name: _____
Title: <u>President</u>          Date: _____   Title: _____   Date: _____

By: _____               By: _____

By (signature): _____            By (signature): _____
Printed Name: _____              Printed Name: _____
Title: _____   Date: _____     Title: _____   Date: _____

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com     7490 N. FM 1560

Exhibit A
7490A: N. FM 1560

**FM 1560**

(N 24°36'00" E 197.47')
N 23°32'22" E  199.78'

SCALE: 1"=100'

POINT OF
BEGINNING

Septic Tank

~ 30' Land Lord
Right of way.

C.M.

48.9'    COV.    48.8'    ASPHALT
69.8'    CONC.    69.6'

CONC.

SIDING
SHED

ONE
STORY
METAL
BUILDING

SIDING SHED
ON CONC.

7.5'        67.7'

COV.
CONC.

~ 110'

CONC.

(N 64°22'53" W 764.46')
N 65°44'06" W  763.40'

S 65°44'06" E  763.40'
(S 64°22'53" E  764.46')

SUBJECT TRACT
152,498 SQ. FT.
3.501 ACRES

DOMINION GRAND PARTNERS I LTD.
142.056 ACRES
VOL. 15954 PG. 2266

S.A.M.T. HOLDING
15.242 ACRES
VOL. 10697 PG. 1277

C.M.

S 23°32'22" W  199.78'
(S 24°36'00" W 197.47')

NOTE:
Bearings shown hereon are based on actual GPS
Observations, Texas State Plane Coordinates, South
Central Zone, Grid.

NOTE:
NO RESTRICTIVE COVENANTS OF RECORD WERE FOUND.

THIS SURVEY IS
ACKNOWLEDGED AND
IS ACCEPTED:

FLOOD ZONE INTERPRETATION: IT IS THE RESPONSIBILITY OF ANY INTERESTED PERSONS TO VERIFY THE ACCURACY OF FEMA FLOOD ZONE DESIGNATION OF THIS PROPERTY WITH FEMA AND STATE AND LOCAL OFFICIALS, AND TO DETERMINE THE EFFECT THAT SUCH DESIGNATION MAY HAVE REGARDING THE INTENDED USE OF THE PROPERTY. The property made the subject of this survey appears to be included in a FEMA Flood Insurance Rate Map (FIRM), identified as Community No. 48029C , Panel No. 0215G , which is Dated 09-29-2010 . By scaling from that FIRM, it appears that all or a portion of the property may be in Flood Zone(s) AE . Because this is a boundary survey, the survey did not take any actions to determine the Flood Zone status of the surveyed property other than to interpret the information set out on FEMA'S FIRM, as described above. THIS SURVEYOR DOES NOT CERTIFY THE ACCURACY OF THIS INTERPRETATION OF THE FLOOD ZONES, which may not agree with the interpretations of FEMA or state or local officials, and which may not agree with the tract's actual conditions. More information concerning FEMA's Special Flood Hazard Areas and Zones may be found at http://www.fema.gov/index.shtm.

**Property Address:**
7490 N. FM 1560



## TEXAS ASSOCIATION OF REALTORS®
# COMMERCIAL LEASE ADDENDUM FOR PARKING

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2010

**ADDENDUM TO THE COMMERCIAL LEASE BETWEEN THE UNDERSIGNED PARTIES CONCERNING THE LEASED PREMISES AT** 7490 N. FM 1560, SAN ANTONIO,   78254

A. <u>Parking Type</u>:

☐ (1) <u>Common Parking</u>: Tenant and Tenant's employees may park no more than _____ vehicles on the Property in the common parking areas located on the Property.

☐ (2) <u>Restricted Common Parking for Tenants</u>: Tenant and Tenant's employees may park no more than _____ vehicles on the Property in the areas restricted for use by tenants of the Property.

☐ (3) <u>Assigned Parking</u>: Tenant's assigned parking areas are identified as follows:

  ☐ (a) _____
  _____
  _____
  _____
  _____ .

  ☐ (b) as shown on the attached Exhibit _____ .

B. In addition to any other rent, Tenant will pay, on or before the first day of each month during the term of the above-referenced lease, $ _____ as rent for the parking areas.

C. Tenant may not assign, sublet, or trade any parking space or parking area.

D. Tenant may not use any parking spaces or areas on the Property to store any vehicle, boats, trailers motor homes, storage containers, or any other personal property.

E. Tenant's guests, patrons, or invitees may park only in those areas designated by Landlord for Tenant's guests, patrons, or invitees.

F. Landlord may, but is not obligated to, institute controlled-access systems to the parking areas, including but not limited to systems such as vehicle identification stickers, license numbers, or controlled-access devices. At the time the lease ends, Tenant must return all access devices to Landlord and pay the amounts in (2) and (3) below if Tenant fails to return an access device. If Landlord issues controlled-access devices to Tenant, Tenant will:
(1) promptly report any lost device to Landlord;
(2) reimburse Landlord its cost to replace the lost access device; and
(3) pay Landlord a service fee of $ 100.00_____ for each lost access device.

(TAR-2107) 1-26-10       Initialed for Identification by Landlord: _MV_____ , and Tenant: _hr____       Page 1 of 2

Parking Addendum concerning _____ 7490 N. FM 1560, SAN ANTONIO,   78254 _____

G. If Tenant fails to timely pay the rent stated in Paragraph B, Landlord may: (i) exercise Landlord's remedies under the default provisions of the lease; or (ii) terminate Tenant's access to the restricted or assigned parking areas by providing Tenant with not less than 5 days written notice of Landlord's intent to terminate Tenant's access. If Landlord terminates Tenant's access to the parking areas under this paragraph, the parking areas will be deemed to be released by Tenant for all purposes and Landlord may assign or lease the parking areas to others.

H. Special Provisions:
   Tenant may not block Landlords access to back property.

Landlord: Villegas Masonry Inc.                    Tenant: Novauto LLC

By: Moises Villegas                                 By: Jose Novales

   By (signature): _____                   By (signature): _____
   Printed Name: Moises G. Villegas                     Printed Name: _____
   Title: President                                     Title: _____

By: _____                               By: _____

   By (signature): _____                   By (signature): _____
   Printed Name: _____                      Printed Name: _____
   Title: _____                             Title: _____

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com                7490 N. FM 1560



TEXAS ASSOCIATION OF REALTORS®

## COMMERCIAL LANDLORD'S RULES AND REGULATIONS

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2010

**REGARDING THE COMMERCIAL LEASE CONCERNING THE LEASED PREMISES AT** <u>7490 N. FM</u>
<u>1560, SAN ANTONIO,   78254</u>

**NOTICE:** These rules and regulations are adopted to maintain and enhance the safety and appearance of the Property. From time to time Landlord, at its discretion, may amend these rules and regulations for the purposes for which they were adopted. Under the above-referenced lease, Tenant agrees to comply with these rules and regulations as they may be amended. Exceptions or waivers must be authorized by Landlord in writing. "Property" means the building or complex in which the leased premises are located, inclusive of any common areas, drives, parking areas, and walks, and landscaped areas.

A. ~~Goods, merchandise, equipment, or any personal property may not be stored on the Property, except for inventory within the leased premises necessary for Tenant's normal business operations.~~

B. ~~Food is not permitted on the Property, except as inventory for sale and for a small amount of food for Tenant's personal consumption.~~

C. ~~Other than those provided by Landlord or specifically authorized by Landlord, no vending machines are permitted on the Property.~~

D. The Property may not be used for lodging or sleeping quarters in any manner.

E. Unless authorized by law or the lease, no animals may be brought or kept on the Property.

F. No obstruction or interference that impedes use of the common areas, walks, drives, loading areas, parking areas, corridors, hallways, vestibules, and stairs is permitted on the Property.

G. Persons parking on the Property must comply with all posted signs and directions regulating the parking areas.

H. ~~No flammable, toxic, noxious, or hazardous materials may be kept on the Property except for over-the-counter cleaning materials kept in enclosed storage closets or cabinets.~~

I. Tenants moving in or out of the Property must use only the service entrances and service elevators during the move. All moves must be made at times that do not cause inconvenience in the normal use of the Property.

J. Deliveries and shipping of goods and merchandise in or out of the Property must be made only through the service entrances, service elevators, loading docks, or other designated shipping and receiving areas. Shipments and deliveries must be made at times that do not cause inconvenience to tenants or patrons on the Property.

K. Leased premises must be kept clean and free of debris. Trash must be deposited into appropriate receptacles. Trash receptacles controlled by Tenant must not be allowed to overflow, attract rodents or vermin, or emit odors.

(TAR-2108) 1-26-10      Initialed for Identification by Landlord: _____MU_____ , and Tenant: _____      Page 1 of 2

The Horn Company Real Estate Group, 15001 Old Bandera Rd Helotes, TX 78023
Phone: 210.887.8736          Fax: 210-525-8811          Mike Castillo

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

7490 N. FM 1560

Landlord's Rules and Regulations concerning <u>7490 N. FM 1560, SAN ANTONIO,     78254</u>

L.  Repair requests must be submitted to Landlord in writing in compliance with the lease.

M.  No modification to the Property and leased premises may be made unless authorized by Landlord, in writing, or permitted by the lease.

N.  No illegal or offensive activity is permitted on the Property nor is any activity that constitutes a nuisance or interferes with the rights of other tenants.

O.  Unless specifically authorized by Landlord, no solicitation or business operations are permitted in the common areas.

P.  <u>Other</u>:

(TAR-2108) 1-26-10     Initialed for Identification by Landlord:_____,_____ , and Tenant:_____,_____     Page 2 of 2



TEXAS ASSOCIATION OF REALTORS®
# INFORMATION ABOUT SPECIAL FLOOD HAZARD AREAS

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc., 2014

**CONCERNING THE PROPERTY AT** _____7490 N. FM 1560_____
_____SAN ANTONIO,  78254_____

## A. FLOOD AREAS:

(1) The Federal Emergency Management Agency (FEMA) designates areas that have a high risk of flooding as special flood hazard areas.

(2) A property that is in a special flood hazard area lies in a "V-Zone" or "A-Zone" as noted on flood insurance rate maps. Both V-Zone and A-Zone areas are areas with high risk of flooding.

(3) Some properties may also lie in the "floodway" which is the channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge a flood under FEMA rules. Communities must regulate development in these floodways.

## B. AVAILABILITY OF FLOOD INSURANCE:

(1) Generally, flood insurance is available regardless of whether the property is located in or out of a special flood hazard area. Contact your insurance agent to determine if any limitations or restrictions apply to the property in which you are interested.

(2) FEMA encourages every property owner to purchase flood insurance regardless of whether the property is in a high, moderate, or low risk flood area.

(3) A homeowner may obtain flood insurance coverage (up to certain limits) through the National Flood Insurance Program. Supplemental coverage is available through private insurance carriers.

(4) A mortgage lender making a federally related mortgage will require the borrower to maintain flood insurance if the property is in a special flood hazard area.

## C. GROUND FLOOR REQUIREMENTS:

(1) Many homes in special flood hazard areas are built-up or are elevated. In elevated homes the ground floor typically lies below the base flood elevation and the first floor is elevated on piers, columns, posts, or piles. The base flood elevation is the highest level at which a flood is likely to occur as shown on flood insurance rate maps.

(2) Federal, state, county, and city regulations:

    (a) restrict the use and construction of any ground floor enclosures in elevated homes that are in special flood hazard areas.

    (b) may prohibit or restrict the remodeling, rebuilding, and redevelopment of property and improvements in the floodway.

(3) The first floor of all homes must now be built above the base flood elevation.

    (a) Older homes may have been built in compliance with applicable regulations at the time of construction and may have first floors that lie below the base flood elevation, but flood insurance rates for such homes may be significant.

(TAR 1414) 01-01-14

The Horn Company Real Estate Group, 15001 Old Bandera Rd Helotes, TX 78023          Phone: 210.887.8736          Fax: 210-525-8811
Mike Castillo                              Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Page 1 of 3
7490 N. FM 1560

Information about Special Flood Hazard Areas concerning _____ 7490 N. FM 1560
SAN ANTONIO,   78254 _____

(b) It is possible that modifications were made to a ground floor enclosure after a home was first built. The modifications may or may not comply with applicable regulations and may or may not affect flood insurance rates.

(c) It is important for a buyer to determine if the first floor of a home is elevated at or above the base flood elevation. It is also important for a buyer to determine if the property lies in a floodway.

(4) Ground floor enclosures that lie below the base flood elevation may be used only for: (i) parking; (ii) storage; and (iii) building access. Plumbing, mechanical, or electrical items in ground floor enclosures that lie below the base flood elevation may be prohibited or restricted and may not be eligible for flood insurance coverage. Additionally:

(a) in A-Zones, the ground floor enclosures below the base flood elevation must have flow-through vents or openings that permit the automatic entry and exit of floodwaters;

(b) in V-Zones, the ground floor enclosures must have break-away walls, screening, or lattice walls; and

(c) in floodways, the remodeling or reconstruction of any improvements may be prohibited or otherwise restricted.

## D. COMPLIANCE:

(1) The above-referenced property may or may not comply with regulations affecting ground floor enclosures below the base flood elevation.

(2) A property owner's eligibility to purchase or maintain flood insurance, as well as the cost of the flood insurance, is dependent on whether the property complies with the regulations affecting ground floor enclosures.

(3) A purchaser or property owner may be required to remove or modify a ground floor enclosure that is not in compliance with city or county building requirements or is not entitled to an exemption from such requirements.

(4) A flood insurance policy maintained by the current property owner does not mean that the property is in compliance with the regulations affecting ground floor enclosures or that the buyer will be able to continue to maintain flood insurance at the same rate.

(5) Insurance carriers calculate the cost of flood insurance using a rate that is based on the elevation of the lowest floor.

(a) If the ground floor lies below the base flood elevation and does not meet federal, state, county, and city requirements, the ground floor will be the lowest floor for the purpose of computing the rate.

(b) If the property is in compliance, the first elevated floor will be the lowest floor and the insurance rate will be significantly less than the rate for a property that is not in compliance.

(c) If the property lies in a V-Zone the flood insurance rate will be impacted if a ground floor enclosure below the base flood elevation exceeds 299 square feet (even if constructed with break-away walls).

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Information about Special Flood Hazard Areas concerning _____ 7490 N. FM 1560
SAN ANTONIO, 78254

## E. ELEVATION CERTIFICATE:

The elevation certificate is an important tool in determining flood insurance rates. It is used to provide elevation information that is necessary to ensure compliance with floodplain management laws. To determine the proper insurance premium rate, insurers rely on an elevation certificate to certify building elevations at an acceptable level above flood map levels. If available in your area, it is recommended that you obtain an elevation certificate for the property as soon as possible to accurately determine future flood insurance rates.

**You are encouraged to: (1) inspect the property for all purposes, including compliance with any ground floor enclosure requirement; (2) review the flood insurance policy (costs and coverage) with your insurance agent; and (3) contact the building permitting authority if you have any questions about building requirements or compliance issues.**

Receipt acknowledged by:



| | |
|---|---|
| Signature | Date |
| **Novauto LLC** | |

Signature                                                             Date



## TEXAS ASSOCIATION OF REALTORS®

## COMMERCIAL LEASEHOLD CONSTRUCTION ADDENDUM
### (Landlord to Complete Construction)

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2010

**ADDENDUM TO THE COMMERCIAL LEASE BETWEEN THE UNDERSIGNED PARTIES CONCERNING THE LEASED PREMISES AT** 7490 N. FM 1560, SAN ANTONIO,   78254

A.  On or before _____ July 1, 2016 _____ , Landlord will substantially complete the improvements to the leased premises as described below.

☒ (1)  Landlord will complete the following improvements:
　　　　Landlord to build perimeter chain link fence for leased premises

☐ (2)  On or before _____ , Tenant will specify in a separate written notice to Landlord the improvements that Tenant desires Landlord to complete. If Landlord objects to any desired improvement, Tenant will promptly amend Tenant's notice to comply with Landlord's objections. Landlord will not unreasonably object to Tenant's desired improvements.

B.  On or before _____ , Landlord will notify Tenant of the total cost to complete the improvements described in Paragraph A, including but not limited to costs of construction, permits, and plans. The total cost to complete the improvements may not exceed _____ (maximum cost). Landlord will pay _____ of the cost to complete the improvements and Tenant will pay the remainder. If the total cost to complete the improvements exceeds the maximum cost, the lease will terminate and have no further effect unless a party notifies the other party within _____ days after Landlord notifies Tenant of the cost to complete the improvements that it will pay the excess.

C.  Unless otherwise agreed by the parties in writing, any amount required to be paid by Tenant under this addendum must be paid by Tenant to Landlord before construction of the improvements commences.

D.  All construction required by this addendum will be performed by trained and qualified persons in a good workman-like manner and will comply with applicable building codes, local ordinances, governmental regulations, and statutes (e.g., ADA, Architectural Barriers). Landlord will obtain any required certificate of occupancy.

(TAR-2111) 1-26-10          Initialed for Identification by Landlord: _MV_ , _____ , and Tenant _____          Page 1 of 2

Leasehold Construction Addendum concerning **7490 N. FM 1560, SAN ANTONIO,    78254**

E.  Tenant may, at reasonable times during construction, inspect the construction of the improvements. Tenant may object to any deficiencies in the completion of the improvements by providing specific written notice to Landlord and Landlord will promptly cure the deficiencies. Upon completion of the improvements, Tenant will acknowledge in writing (e.g., TAR No. 2113) that the improvements have been completed and that Tenant accepts the leased premises for the purposes of the lease.

F.  Paragraph 3B of the lease governs any delay in the commencement of the lease or occupancy by Tenant caused by the construction of the improvements.

G.  <u>Special Provisions</u>:

**Landlord:** Villegas Masonry Inc.

By: **Moises Villegas**

By (signature): _____
Printed Name: **Moises Villegas**
Title: **President**

By: _____

By (signature): _____
Printed Name: _____
Title: _____

**Tenant:** Novauto LLC

By: **Jose Novales**

By (signature): _____
Printed Name: _____
Title: _____

By: _____

By (signature): _____
Printed Name: _____
Title: _____

(TAR-2111) 1-26-10

Page 2 of 2



TEXAS ASSOCIATION OF REALTORS®

# COMMERCIAL LEASE ADDENDUM FOR BROKER'S FEE

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of Realtors®, Inc. 2014

**ADDENDUM TO THE COMMERCIAL LEASE BETWEEN THE UNDERSIGNED LANDLORD AND TENANT CONCERNING THE LEASED PREMISES AT** <u>7490 N. FM 1560, SAN ANTONIO,    78254</u>

A. <u>Leasing Fees</u>: All leasing fees are earned when the above referenced lease is executed.

   (1) <u>      Landlord      </u> will pay Principal Broker a leasing fee calculated and payable as follows:

      ☐ (a) _____ % of all base monthly rents to be paid for the term of the lease and the same percentage of the expense reimbursements stated or estimated in the lease, payable as follows: one-half of such amount at the time Landlord and Tenant execute the lease and the remainder on the date the lease commences.

      ☒ (b) <u>  3.000  </u> % of all base monthly rents to be paid for the term of the lease and the same percentage of the expense reimbursements stated or estimated in the lease, payable as follows: <u>$3000 at execution and $440.00 per month from 11/1/2016 –</u> <u>6/30/21</u> .

      ☐ (c) _____ .

   (2) _____ will pay Cooperating Broker a leasing fee calculated and payable as follows:

      ☐ (a) _____ % of all base monthly rents to be paid for the term of the lease and the same percentage of the expense reimbursements stated or estimated in the lease, payable as follows: one-half of such amount at the time Landlord and Tenant execute the lease and the remainder on the date the lease commences.

      ☐ (b) _____ % of all base monthly rents to be paid for the term of the lease and the same percentage of the expense reimbursements stated or estimated in the lease, payable as follows: _____

      _____ .

      ☐ (c) _____ .

B. <u>Renewal and Expansion Fees</u>: If Landlord and Tenant subsequently renew, extend, or expand the lease, including a new lease for more, less, or different space in the Property or in any other property owned, controlled, or managed by Landlord, the brokers will be paid the fees set forth below. The fees will be earned and payable when the extension, renewal, expansion, or new lease is executed or commences, whichever is earlier.

   (1) <u>      Landlord      </u> will pay Principal Broker a renewal fee of:

      ☒ (a) <u>  3.000  </u> % of all base monthly rents to be paid for the term of the renewal, extension, or new lease and the same percentage of the expense reimbursements stated or estimated in the lease governing the renewal, extension, or new lease;

(TAR-2102) 4-1-14    Initialed for Identification by Landlord: _____ , and Tenant: _____    Page 1 of 3

The Horn Company Real Estate Group, 15001 Old Bandera Rd Helotes, TX 78023
Phone: 210.887.8736    Fax: 210-525-8811    Mike Castillo    7490 N. FM 1560

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Addendum for Broker's Fee concerning <u>7490 N. FM 1560, SAN ANTONIO,     78254</u>

☐ (b) _____ % of all base monthly rents to be paid for the term of the expansion and the same percentage of the expense reimbursements stated or estimated in the lease governing the expansion; or

☐ (c) _____
_____ .

(2) _____ will pay Cooperating Broker a renewal fee of:

☐ (a) _____ % of all base monthly rents to be paid for the term of the renewal, extension, or new lease and the same percentage of the expense reimbursements stated or estimated in the lease governing the renewal, extension, or new lease;

☐ (b) _____ % of all base monthly rents to be paid for the term of the expansion and the same percentage of the expense reimbursements stated or estimated in the lease governing the expansion; or

☐ (c) _____
_____ .

C. <u>Fees in the Event of a Sale</u>: If, during any time the lease is in effect or during any time Tenant occupies the leased premises, including any extension, renewal, or expansion, Tenant agrees to purchase the leased premises or Property by oral or written agreement or option, brokers will be paid the additional fees set forth below. The additional fees will be earned at the time Landlord and Tenant enter into an agreement for the sale, purchase, or option for the leased premises or Property, and are payable at the time the sale or purchase closes.

(1) _____<u>Landlord</u>_____ will pay Principal Broker an additional fee of:

☒ (a) ___<u>6.000</u>___ % of the sales price for the purchase.

☐ (b) _____ .

(2) _____ will pay Cooperating Broker an additional fee of:

☐ (a) _____ % of the sales price for the purchase.

☐ (b) _____ .

D. <u>County</u>: All fees under this addendum are payable in _____<u>BEXAR</u>_____ County, Texas.

E. <u>Attorney's Fees</u>: If Landlord, Tenant, or any broker is a prevailing party in any legal proceeding brought as a result of a dispute under this addendum or any transaction related to or contemplated by this addendum, such party will be entitled to recover from the non-prevailing parties all costs of such proceeding, prejudgment interest, and reasonable attorney's fees.

F. <u>Special Provisions</u>:

Addendum for Broker's Fee concerning **7490 N. FM 1560, SAN ANTONIO,   78254**

> *NOTICE: Under Chapter 62, Texas Property Code, Broker is entitled to claim a lien against the Property to secure payment of an earned commission.*

Landlord:**Villegas Masonry Inc.**      Tenant:**Novauto LLC**

By: **Moises Villegas**      By: **Jose Novales**

By (signature): _____      By (signature): _____
Printed Name: **Moises Villegas**      Printed Name: _____
Title: **President**      Title: _____

By: _____      By: _____

By (signature): _____      By (signature): _____
Printed Name: _____      Printed Name: _____
Title: _____      Title: _____

**Principal Broker:**      **Cooperating Broker:**

Broker / Company Name: _____      Broker / Company Name: _____

_____ License No. _____      _____ License No. _____

By (signature): _____      By (signature): _____
Printed Name: _____      Printed Name: _____
Title: _____ License No. _____      Title: _____ License No. _____

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com      7490 N. FM 1560



## TEXAS ASSOCIATION OF REALTORS®
# COMMERCIAL LEASE ADDENDUM FOR EXPENSE REIMBURSEMENT

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2010

**ADDENDUM TO THE COMMERCIAL LEASE BETWEEN THE UNDERSIGNED PARTIES CONCERNING THE LEASED PREMISES AT** <u>7490 N. FM 1560, SAN ANTONIO,   78254</u>

In addition to rent stated in the lease, Tenant will pay Landlord the additional rent described in this addendum. Tenant will pay the additional rent each month at the time the base-monthly rent in the lease is due.

A. <u>Definitions</u>:

    (1) *"Tenant's pro rata share"* is <u>60.000</u> %.

    (2) *"CAM"* means all of Landlord's expenses reasonably incurred to maintain, repair, operate, manage, and secure the Property (for example, security, lighting, painting, cleaning, decorations, utilities, trash removal, pest control, promotional expenses, and other expenses reasonably related the Property's operations); CAM does not include capital expenditures, interest, depreciation, tenant improvements, insurance, taxes, or brokers' leasing fees Notwithstanding the foregoing, CAM does include the amortized costs incurred by Landlord in making capital improvements or other modifications to the Property to the extent such improvements or modifications reduce CAM overall. These costs will be amortized over the useful life of the improvement or modification on a straight-line basis; however, in no event will the charge for such amortization included in CAM exceed the actual reduction in CAM achieved by the improvements and modifications.

    (3) *"Insurance"* means Landlord's costs to insure the leased premises and the Property including but not limited to insurance for casualty loss, general liability, and reasonable rent loss.

    (4) *"Taxes"* means the real property ad valorem taxes assessed against the leased premises and Property inclusive of all general and special assessments and surcharges.

    (5) *"Structural"* means all of Landlord's expenses reasonably incurred to maintain, repair, and replace the roof, foundation, exterior walls, load bearing walls and other structural components of the Property.

B. <u>Method</u>: The additional rent will be calculated under the following method:
    *Note: "CAM" does not include taxes and insurance costs.*

☒ (1) <u>Base-year expenses</u>: Each month Tenant will pay Tenant's pro rata share of the projected monthly expenses for the Property that exceed the amount of the monthly base-year expenses for the calendar year <u>2019</u> for: ☒ taxes; ❑ insurance; ❑ CAM; ❑ structural; and ❑ _____.

❑ (2) <u>Expense-stop</u>: Each month Tenant will pay Tenant's pro rata share of the projected monthly expenses for the Property that exceed $ _____ per square foot per year for: ❑ taxes; ❑ insurance; ❑ CAM; ❑ structural; and ❑ _____.

❑ (3) <u>Net</u>: Each month Tenant will pay Tenant's pro rata share of the projected monthly expenses for the Property for: ❑ taxes; ❑ insurance; ❑ CAM; ❑ structural; and ❑ _____.

C. <u>Projected Monthly Expenses</u>: On or about December 31 of each calendar year, Landlord will project the applicable monthly expenses (those that Tenant is to pay under this addendum) for the following calendar year and will notify Tenant of the projected expenses. The projected expenses are based on Landlord's estimates of such expenses. The actual expenses may vary.

(TAR-2103) 1-26-10          Initialed for Identification by Landlord: _MV_ , and Tenant: _____          Page 1 of 2

The Horn Company Real Estate Group, 15001 Old Bandera Rd Helotes, TX 78023
Phone:210.887.8736          Fax: 210-525-8811          Mike Castillo                                          7490 N. FM 1560
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Expense Reimbursement Addendum concerning **7490 N. FM 1560, SAN ANTONIO,    78254**

Notice: The applicable projected expenses at the time which the above-referenced lease commences are shown in the table below. The total area of the Property presently used by Landlord for calculating expense reimbursements is _____ rentable square feet (including any add on factor for common areas).

| Projected Expenses | |
| --- | --- |
| $ Monthly Rate | $ Annual Rate |
| / rsf / month | / rsf / year |

D. Reconciliation: Within a reasonable time after the end of each calendar year, Landlord will notify Tenant of the actual costs of the applicable expenses (those that Tenant is to pay under this addendum) for the previous year. If the actual costs of the applicable expenses exceed the amounts paid or owed by Tenant for the previous year, Tenant must pay the deficient amount to Landlord within 30 days after Landlord notifies Tenant of the deficient amount. If the actual costs of the applicable expenses are less than the amounts paid by Tenant for the previous year, Landlord will refund the excess to Tenant or will credit the excess to Tenant's next rent payment. Tenant may audit or examine those items in Landlord's records that relate to Tenant's obligations under this addendum. Landlord will promptly refund to Tenant any overpayment revealed by an audit or examination. If the audit or examination reveals an error of more than 5% over the amounts Landlord collected in a calendar year from Tenant under this addendum, Landlord will pay the reasonable cost of the audit or examination. Landlord may not seek a deficiency from Tenant under this paragraph if Landlord fails to timely provide the required notice.

E. Special Provisions:

Landlord:<u>Villegas Masonry Inc.</u>                     Tenant: Nov<u>auto LLC</u>

By: <u>Moises Villegas</u>                                    By: <u>Jose Novales</u>

By (signature): _____          By (signature): _____
Printed Name: <u>Moises Villegas</u>                        Printed Name: _____
Title:<u>President</u>                                           Title: _____

By: _____                          By: _____

By (signature): _____          By (signature): _____
Printed Name: _____          Printed Name: _____
Title: _____                       Title: _____

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

7490 N. FM 1560



## TEXAS ASSOCIATION OF REALTORS®

# INFORMATION ABOUT ON-SITE SEWER FACILITY

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc., 2004

<u>**CONCERNING THE PROPERTY AT**</u>  7490 N. FM 1560  SAN ANTONIO,   78254

**A. DESCRIPTION OF ON-SITE SEWER FACILITY ON PROPERTY:**

(1) Type of Treatment System: ☑ Septic Tank    ☐ Aerobic Treatment    ☐ Unknown
☐ _____

(2) Type of Distribution System: _____    ☑ Unknown

(3) Approximate Location of Drain Field or Distribution System: _____    ☐ Unknown
Front Right
_____
_____

(4) Installer: _____    ☑ Unknown

(5) Approximate Age: _____    ☑ Unknown

**B. MAINTENANCE INFORMATION:**

(1) Is Seller aware of any maintenance contract in effect for the on-site sewer facility?    ☐ Yes  ☑ No
If yes, name of maintenance contractor: _____
Phone: _____ contract expiration date: _____
*Maintenance contracts must be in effect to operate aerobic treatment and certain non-standard" on-site sewer facilities.)*

(2) Approximate date any tanks were last pumped? _____ 2013 _____

(3) Is Seller aware of any defect or malfunction in the on-site sewer facility?    ☐ Yes  ☑ No
If yes, explain: _____
_____
_____

(4) Does Seller have manufacturer or warranty information available for review?    ☐ Yes  ☑ No

**C. PLANNING MATERIALS, PERMITS, AND CONTRACTS:**

(1) The following items concerning the on-site sewer facility are attached:
☐ planning materials ☐ permit for original installation ☐ final inspection when OSSF was installed
☐ maintenance contract ☐ manufacturer information ☐ warranty information ☐ _____ None

(2) "Planning materials" are the supporting materials that describe the on-site sewer facility that are submitted to the permitting authority in order to obtain a permit to install the on-site sewer facility.

(3) **It may be necessary for a buyer to have the permit to operate an on-site sewer facility transferred to the buyer.**

(TAR-1407) 1-7-04          Initialed for Identification by Buyer _____, _____ and Seller _MV_, _____    Page 1 of 2

The Horn Company Real Estate Group, 15001 Old Bandera Rd Helotes, TX 78023
Phone: 210.887.8736        Fax: 210-525-8811        Mike Castillo                                    7490 N. FM 1560
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

7490 N. FM 1560
SAN ANTONIO,   78254

· Information about On-Site Sewer Facility concerning _____

**D. INFORMATION FROM GOVERNMENTAL AGENCIES:** Pamphlets describing on-site sewer facilities are available from the Texas Agricultural Extension Service. Information in the following table was obtained from Texas Commission on Environmental Quality (TCEQ) on 10/24/2002. The table estimates daily wastewater usage rates. Actual water usage data or other methods for calculating may be used if accurate and acceptable to TCEQ.

| Facility | Usage (gal/day) without water-saving devices | Usage (gal/day) with water-saving devices |
|---|---|---|
| Single family dwelling (1-2 bedrooms; less than 1,500 sf) | 225 | 180 |
| Single family dwelling (3 bedrooms; less than 2,500 sf) | 300 | 240 |
| Single family dwelling (4 bedrooms; less than 3,500 sf) | 375 | 300 |
| Single family dwelling (5 bedrooms; less than 4,500 sf) | 450 | 360 |
| Single family dwelling (6 bedrooms; less than 5,500 sf) | 525 | 420 |
| Mobile home, condo, or townhouse (1-2 bedroom) | 225 | 180 |
| Mobile home, condo, or townhouse (each add'l bedroom) | 75 | 60 |

**This document is not a substitute for any inspections or warranties. This document was completed to the best of Seller's knowledge and belief on the date signed. Seller and real estate agents are not experts about on-site sewer facilities. Buyer is encouraged to have the on-site sewer facility inspected by an inspector of Buyer's choice.**

| | | | |
|---|---|---|---|
| Signature of Seller | Date | Signature of Seller | Date |

Villegas Masonary Inc

Receipt acknowledged by:

| | | | |
|---|---|---|---|
| Signature of Buyer | Date | Signature of Buyer | Date |

Novauto LLC

(TAR-1407) 1-7-04                                                                                               Page 2 of 2

# Information About Brokerage Services

11-2-2015

*Texas law requires all real estate license holders to give the following information about brokerage services to prospective buyers, tenants, sellers and landlords.*

**TYPES OF REAL ESTATE LICENSE HOLDERS:**
- **A BROKER** is responsible for all brokerage activities, including acts performed by sales agents sponsored by the broker.
- **A SALES AGENT** must be sponsored by a broker and works with clients on behalf of the broker.

**A BROKER'S MINIMUM DUTIES REQUIRED BY LAW (A client is the person or party that the broker represents):**
- Put the interests of the client above all others, including the broker's own interests;
- Inform the client of any material information about the property or transaction received by the broker;
- Answer the client's questions and present any offer to or counter-offer from the client; and
- Treat all parties to a real estate transaction honestly and fairly.

**A LICENSE HOLDER CAN REPRESENT A PARTY IN A REAL ESTATE TRANSACTION:**

**AS AGENT FOR OWNER (SELLER/LANDLORD):** The broker becomes the property owner's agent through an agreement with the owner, usually in a written listing to sell or property management agreement. An owner's agent must perform the broker's minimum duties above and must inform the owner of any material information about the property or transaction known by the agent, including information disclosed to the agent or subagent by the buyer or buyer's agent.

**AS AGENT FOR BUYER/TENANT:** The broker becomes the buyer/tenant's agent by agreeing to represent the buyer, usually through a written representation agreement. A buyer's agent must perform the broker's minimum duties above and must inform the buyer of any material information about the property or transaction known by the agent, including information disclosed to the agent by the seller or seller's agent.

**AS AGENT FOR BOTH - INTERMEDIARY:** To act as an intermediary between the parties the broker must first obtain the written agreement of *each party* to the transaction. The written agreement must state who will pay the broker and, in conspicuous bold or underlined print, set forth the broker's obligations as an intermediary. A broker who acts as an intermediary:
- Must treat all parties to the transaction impartially and fairly;
- May, with the parties' written consent, appoint a different license holder associated with the broker to each party (owner and buyer) to communicate with, provide opinions and advice to, and carry out the instructions of each party to the transaction.
- Must not, unless specifically authorized in writing to do so by the party, disclose:
  - that the owner will accept a price less than the written asking price;
  - that the buyer/tenant will pay a price greater than the price submitted in a written offer; and
  - any confidential information or any other information that a party specifically instructs the broker in writing not to disclose, unless required to do so by law.

**AS SUBAGENT:** A license holder acts as a subagent when aiding a buyer in a transaction without an agreement to represent the buyer. A subagent can assist the buyer but does not represent the buyer and must place the interests of the owner first.

**TO AVOID DISPUTES, ALL AGREEMENTS BETWEEN YOU AND A BROKER SHOULD BE IN WRITING AND CLEARLY ESTABLISH:**
- The broker's duties and responsibilities to you, and your obligations under the representation agreement.
- Who will pay the broker for services provided to you, when payment will be made and how the payment will be calculated.

**LICENSE HOLDER CONTACT INFORMATION:** This notice is being provided for information purposes. It does not create an obligation for you to use the broker's services. Please acknowledge receipt of this notice below and retain a copy for your records.

| Roy Horn Real Estate Group | 9000241 | ROYHORN@THEHORNCO.COM | (210) 695-5000 |
|---|---|---|---|
| Licensed Broker/Broker Firm Name or Primary Assumed Business Name | License No. | Email | Phone |
| ROY HORN | 288635 | ROYHORN@THEHORNCO.COM | (210) 695-5000 |
| Designated Broker of Firm | License No. | Email | Phone |
| | | | |
| Licensed Supervisor of Sales Agent/ Associate | License No. | Email | Phone |
| MIKE CASTILLO | 547206 | mikecastillo@thehornco.com | (210) 887-8736 |
| Sales Agent/Associate's Name | License No. | Email | Phone |

Buyer/Tenant/Seller/Landlord Initials       06082016       Date

**Regulated by the Texas Real Estate Commission**      **Information available at www.trec.texas.gov**

TAR 2501      IABS 1-0

The Horn Company Real Estate Group, 15001 Old Bandera Rd Helotes, TX 78023      Phone: 210.887.8736      Fax:210-525-8811      7490 N. FM 1560
Mike Castillo      Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com